**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-30843

MICHAEL J. GACHOT,

Petitioner - Appellee,

VERSUS

RICHARD STALDER,

Respondent;

STATE OF LOUISIANA and KELLY WARD, WARDEN,

Appellants.

Appeal from the United States District Court
for the Western District of Louisiana

July 15, 2002

Before SMITH, BENAVIDES, and PARKER, Circuit Judges
ROBERT M. PARKER, Circuit Judge

The State of Louisiana (hereinafter, "the State") appeals from the district court's grant of a conditional writ of *habeas corpus* on the voluntariness of a juvenile's confession under police interrogation. We reverse.

**I.  Background.**

1

On September 6, 1991, Appellee Michael Gachot (hereinafter, "Gachot"), then 15 years old, shot and killed his father and then his mother. The father had a history of openly suspecting that Gachot was homosexual and publicly used demeaning language and epithets toward him; he threatened that if he found out that Gachot was homosexual, he would kill him. The parents were actively discussing a divorce and it appears that neither wanted to take custody of Gachot. The parents were both employed by Angola Penitentiary, and the family lived on the grounds. They had a second home off of the prison grounds, however, which is where the shooting took place.

The parents had been arguing on that day about the divorce and Gachot's father threatened to kill Gachot and his mother. During the heated argument, Gachot took his father's pistol and shot him, then shot his mother, killing them both. He claims that he "lost awareness of his actions" until after the shooting.

Gachot then called his 23 year-old half-brother, Clay, who had been a booking deputy in the Avoyelles Parish Sheriff's Department(Avoyelles Parish is where the shooting, interrogation, and trial took place). Gachot told Clay that his father had shot his mother and then had tried to shoot him but that the father was killed in a struggle for the gun.

Clay arranged for friends, who were active deputies, to assist. One of them went to secure the Gachots' home. Gachot had gone to his grandparents' home, while officers and the coroner

2

conducted an investigation. That revealed evidence inconsistent with Gachot's story. The law enforcement agents asked Gachot to the Sheriff's office for a statement. Gachot did so, with his grandmother's permission, given the understanding that his older half-brother, Clay, would be present. He had taken a tranquilizer, Butisol, given to him by his grandmother.

Gachot went to the Sheriff's office at about 11:30 p.m. and remained there for about four hours. During that time, with Clay present, Gachot gave three different statements. He and Clay had been advised of Gachot's Miranda rights prior to each of the three statements and he agreed that he understood them. Initially, he repeated his earlier story in a statement given between 12:19 and 12:51. He was then advised by the law enforcement officers and the coroner that it was better to come across with a true statement, and that the coroner would have to give testimony at trial to discredit Gachot or "tear him apart." He gave a sample of blood. His second statement occurred between 2:14 and 2:25 a.m. and did not result in a confession. He was then directly confronted by a detective who abruptly told Gachot that his statement did not match the physical evidence, upsetting Gachot. The detective left the room and other officers attempted to calm Gachot down. He was again advised to tell the truth. In his third statement, between 3:05 and 3:24 a.m., he confessed to the shootings.

Gachot was indicted on September 25, 1991, for two counts of first degree murder. The District Attorney reduced these charges

3

to two counts of second degree murder on January 6, 1992, the date of trial. Before trial, Gachot moved to suppress his inculpatory statements, which was denied. He re-urged the motion on the date of trial. Gachot was found guilty of manslaughter on count one (the death of his father) and guilty as charged on count two (his mother). Gachot filed a motion for post-conviction judgment of acquittal, which included as a basis for relief the inadmissibility of his confession. The motion was denied and Gachot was sentenced to one to 21 years in prison on the first count and life imprisonment without parole on the second count, to be served consecutively.

His conviction was affirmed on direct appeal. The Louisiana Supreme Court denied his application for writs and his request for reconsideration of the application. He petitioned for a writ of *habeas corpus* on six grounds in the Louisiana district court, court of appeals, and Louisiana Supreme Court, all of which were denied.

Gachot then applied to the U.S. District Court for the Western District of Louisiana on July 2, 1999, for a writ of *habeas corpus* on six grounds. The magistrate judge to whom the case was referred recommended that Gachot's conviction and sentence be reversed and vacated on grounds three and five. Ground three reads:

> The trial court denied the defendant his right against self-incrimination by allowing his statement to the police, by not allowing him a meaningful consultation with an interested adult, other than his brother who obviously could not meaningfully consult with the best interest of Michael Gachot in mind.

4

The district judge concurred with and adopted the magistrate judge's recommendation as to ground three but did not accept his recommendation as to ground five. On June 13, 2001, the district judge granted a conditional writ of *habeas corpus* and ordered Gachot's discharge unless he was returned to the Twelfth Judicial District Court for the Parish of Avoyelles for re-arraignment within 60 days, execution of which was stayed pending the instant appeal.

The State of Louisiana appeals on the basis that Gachot's confession was free and voluntary and that the federal district court failed to give due deference to the state court under the federal *habeas corpus* statute, 28 U.S.C. § 2254, *et seq.*, as modified by the Anti-terrorism and Effective Death Penalty Act ("AEDPA").

**II.  Standard of Review.**

A.  *Habeas* review under the AEDPA.

To prevail on a federal *habeas* application, a petitioner must make a "substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether. . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Moore v. Johnson*, 225 F.3d 495, 500 (5th Cir. 2000), quoting *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).

5

In assessing whether a petitioner has demonstrated a substantial showing of the denial of a constitutional right, the deference scheme laid out in 28 U.S.C. § 2254(d) applies. *See Moore*, 225 F.3d at 501.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under that scheme, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *See* 225 F.3d at 501. The objective standard of *Williams v. Taylor*, 529 U.S. 362 (2000) is used in these analyses.

> As a result, we must defer to the state court unless its decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, [529 U.S. 362, 412-13] (2000). Under §§ 2254(d)(1)'s "unreasonable application" language, a writ may issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, [529 U.S. at 413]. Factual findings are presumed to be correct, *see* §

6

2254(e)(1), and we will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* §§ 2254 (d)(2).

*Moore*, 225 F.3d at 501 (citing *Hill v. Johnson*, 210 F.3d 484-84 (5th Cir. 2000)).

B.   Juvenile confession/waiver of rights.

"[T]he Due Process Clause of the Fourteenth Amendment [prohibits] states from securing criminal convictions through the use of involuntary confessions resulting from coercive police conduct."   *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992)(citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)).   "In addition to the due process prohibition against the use of coerced confessions, the now-familiar procedural safeguards established in [*Miranda v. Arizona*, 384 U.S. 436 (1966)] also protect an accused's Fifth Amendment privilege against self-incrimination during custodial interrogation."   *Id.*   "[W]hile the ultimate issue of voluntariness is a legal question requiring independent factual determination, subsidiary factual questions . . . are entitled to the § 2254(d) presumption."[1]   *Id.* at 1204 (internal quotation marks and citation omitted).

The "totality of the circumstances" approach established by *Miranda*, for reviewing a waiver of Fifth Amendment rights by

---

[1]   Although *Self v. Collins* is a 1992, pre-AEDPA case, the AEDPA only strengthens the stricture imposing a strong requirement of deference for a state court's findings of fact.

adults, is adequate for the determination of whether there is a valid waiver by a juvenile of his rights to remain silent and to have the assistance of counsel. *See United States v. Saucedo-Velasquez*, 843 F.2d 832, 835 (5th Cir. 1988)(citing *Fare v. Michael C.*, 442 U.S. 707 (1979)). The *Michael C.* "totality of the circumstances" standard is the "clearly established Federal law, as determined by the Supreme Court of the United States" governing this circumstance.

Under this approach, the circumstances to be considered include "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Michael C.*, 442 U.S. at 725; *Saucedo-Velasquez,* 843 F.2d at 835.

**III. Analysis.**

At the time that Gachot was interrogated, the Louisiana Supreme Court required that a juvenile in custody be given the opportunity to consult with an interested adult before interrogation. *See State v. Dino*, 359 So.2d 586 (La. 1978). That court later overruled *Dino* and affirmed the "totality of the circumstances" rule in Louisiana following an examination of *Fare v. Michael C.*, *supra*, *Gallegos v. Colorado*, 370 U.S. 49 (1962), and the premises upon which *Dino* was decided. *See State v. Fernandez*,

8

712 So.2d 485, 490 (La. 1998).[2]  Therefore, under the Louisiana Supreme Court's jurisprudence at the time of Gachot's trial in 1992, the *Dino* standard applied.  Although *Dino* placed emphasis on whether the interrogated juvenile had had the opportunity to consult with an interested adult, however, the Louisiana Supreme Court did not ignore a "totality of the circumstances" approach.  In fact, that court reviewed the "totality" factors in *Dino*, *see* 359 So.2d at 591, in addition to whether the juvenile had been afforded the opportunity to consult with an interested adult.  Therefore, although the *Michael C.* standard as enunciated by the U.S. Supreme Court in 1979 was not explicitly adopted by Louisiana jurisprudence until *Fernandez* in 1998, the *Dino* standard in place at the time of Gachot's interrogation in 1991 and trial in 1992 may be fairly understood as recognizing the same principles as in *Michael C.*

Even if the *Dino* standard were read to obviate other "totality" factors in favor of whether the juvenile was afforded access to an interested adult, our review of this case indicates that the Louisiana trial court did not unreasonably ignore a "totality of the circumstances" analysis.

---

[2]  The State of Louisiana takes exception, here, with the wording of Gauchot's issue to the extent that it seems to evoke the earlier *Dino* standard.  Regardless, the preamble to the "interested adult" language in Gachot's issue, "[t]he trial court denied the defendant his right against self-incrimination by allowing his statement to the police," sufficiently invoked a waiver of rights issue for the magistrate judge and the district judge to consider.

The state court, when evaluating the admissibility of Gachot's confession, considered his age, experience, education, background, and intelligence to determine whether he had had adequate access to the counsel of his half-brother, Clay, in the role of an interested adult. The court noted that the interrogation was "conducted in a very, very non-oppressive manner" and that Gachot had been explained his Miranda Fifth Amendment rights at each turn. Although the state court did appear to place more emphasis on whether Gachot had been allowed access to an interested adult, which it found that he had, we cannot see that the court unreasonably ignored the total framework in which the interrogation occurred.

Two U.S. Supreme Court cases guide us in making this "totality" assessment. In *Haley v. Ohio*, 332 U.S. 596 (1948), the U.S. Supreme Court held that a 15-year old who had been arrested at midnight and subjected to continuous interrogation by a rotation of several police officers, without counsel or friend, until he confessed to participating in a robbery and shooting, had been subjected to a violation of due process under the Fourteenth Amendment. *Id.* at 599–601. There, the youth had been taken from his home, held incommunicado, and subjected to continuous interrogation until the early morning hours when he confessed after having been shown the alleged confessions of two other boys involved in the robbery. He was not informed of his right to

10

counsel but was presented with a prepared confession that started off with a statement that he could make the statement or not at his decision, that it could be used against him at trial, and that he was under no duress. It went on with the pre-printed question-and-answer, "[d]o you still desire to make this statement and tell the truth after having had the above clause read to you? A. Yes." He then signed the statement. *Id.* at 598.

The boy's mother was denied access to him. When she brought fresh clothing for him, she found that his old clothes had been torn and bloodied. An attorney hired to represent him was denied access to him, although a newspaper photographer was allowed access to take his picture immediately after the 15 year-old signed the confession. He was held for three days before being taken before a magistrate. In court, he appeared bruised and skinned. *Id.* at 597-98. The Court reviewed the boy's age, experience, the conditions of his interrogation and methods of the interrogating officers, and held that, "[i]f the undisputed evidence suggests that force or coercion was used to exact the confession, we will not permit the judgment of conviction to stand, even though without the confession there might have been sufficient evidence for submission to the jury." *Id.* at 599.

On the other hand, in *Michael C.*, the U.S. Supreme Court found that, given the totality of the circumstances, a 16 1/2 year old juvenile voluntarily and knowingly waived his Fifth Amendment

11

rights under an interrogation in a murder case. There were nothing to indicate that he was unable to understand the nature of his actions; he had considerable experience with the police, having a record of several arrests. There was no indication that he was of insufficient intelligence to understand the rights he was waiving, or the consequences of that waiver. Further, he was not worn down by improper interrogation tactics or lengthy questioning by trickery or deceit. *Michael C.*, 442 U.S. at 726-27. He had had his Miranda rights explained to him and answered that he understood them. He had wanted his probation officer present, but agreed to answer questions without an attorney present when the police declined to bring his probation officer to the interrogation. *Id.* at 700-11.

The instant case is dissimilar in many ways from each of the situations just described, but is substantially closer to the latter. Unlike Haley, Gachot was not arrested and pulled from his home, without counsel, in the middle of the night. He agreed to go to the Sheriff's office to answer questions after having consulted with his grandmother and with the knowledge that Clay would be present. Clay in fact was present throughout the interrogation. Gachot was not subjected to physical abuse nor was he subjected to relentless, continuing questioning by callous police officers for over five hours. Instead, he was questioned three times, ranging from 11 minutes to 32 minutes, over about a three-hour period. His

12

questioning was described as "non-oppressive" and "with kid gloves." To the extent that he was confronted, it was with inconsistencies between his story and the physical evidence at the scene, not with spurious untruths. His interrogators advised him repeatedly of his full Miranda rights, including his right to counsel, unlike the officers in *Haley*.

Although Gachot did not have a considerable police record as did the defendant in *Michael C.*, he had been exposed to law enforcement personnel and procedures for years. His parents were employed by Angola Penitentiary, and they lived on the grounds. His half-brother, Clay, had been employed by the Sheriff's department. He was not "worn down" any more than the *Michael C.* defendant was during questioning. Although Gachot had taken a Butisol given by his grandmother, there is no evidence that it affected his intelligence, understanding, or judgment in deciding to make his statements. Gachot clearly understood his actions and the consequences of them and understood his rights, which had been equally communicated to Clay. Finally, if Clay had harbored ill will toward Gachot after the shootings, there is no manifestation of it in the evidence, which suggests that he fulfilled the role of "interested adult."

Under these circumstances, the decision of the Louisiana state court did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established

13

Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). Because that is the case, the federal court must defer to the findings of the state court and may not issue a writ of *habeas corpus*. *Williams*, 529 U.S. at 412-13.

**IV. Conclusion.**

For the reasons stated herein, the decision of the district court in this case is REVERSED and the conditional writ of *habeas corpus* is hereby REVOKED.