United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 31, 2005**

Charles R. Fulbruge III
Clerk

REVISED APRIL 13, 2005
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-51379

LACRESHA MURRAY, ET AL

Plaintiffs

LACRESHA MURRAY

Plaintiff-Appellee,

versus

RONNIE EARLE, etc.; ET AL

Defendant

DAYNA BLAZEY, Individually and as an Assistant District Attorney of Travis County, Texas; STEPHANIE EMMONS, Individually and as an Assistant District Attorney of Travis County, Texas; ANGELA MCGOWN, Individually and as Supervisor of the Travis County Child Protective Services; HECTOR REVELES, Individually and as a Detective of the Austin Police Department; ERNEST PEDRAZA, Individually and as a Detective of the Austin Police Department; ALBERT EELS, Individually and as a Detective of the Austin Police Department

Defendants-Appellants.

--------------------
Appeal from the United States District Court
for the Northern District of Texas
(A-02-CV-552-SS)
--------------------

Before WIENER and PRADO, Circuit Judges, and KINKEADE,[*] District Judge.

WIENER, Circuit Judge:

Defendants-appellants Dayna Blazey, Stephanie Emmons, Hector

---

[*] District Judge, Northern District of Texas, sitting by designation.

Reveles, Angela McGown, Ernest Pedraza and Albert Eells appeal the district court's denial of their motion for summary judgment on the grounds of immunity under federal and state law. They contend on appeal that they should not be held liable for coercing a confession from the minor plaintiff-appellee, LaCresha Murray, which ultimately led to her later-reversed conviction (and lengthy incarceration) for injury to a child.[1] We reverse.

## I. FACTS AND PROCEEDINGS

This case arises out of the investigation of plaintiff-appellee LaCresha Murray's ("LaCresha") involvement in the death of Jayla Belton, age two, in 1996. At the time of these events, LaCresha was eleven years old. She and her siblings lived with her grandparents, R.L. and Shirley Murray, who were her adoptive parents, as well. The Murrays also provided daycare in their home for several other children.

Late in May of 1996, Jayla, who was routinely cared for by the Murrays, was dropped off at the Murray home by her mother's boyfriend. During the course of the day, Jayla appeared to be ill. After she vomited at the lunch table, LaCresha's older sister, Shawntay, gave Jayla some medication and put her to bed. No one checked on Jayla until later that day. R.L. Murray testified that, late in the afternoon, LaCresha came in from outside and went to

_____

[1] In Texas, juvenile criminal adjudications are civil in nature, therefore, LaCresha's conviction is for a civil, not criminal, offense.

2

the back of the house, near the bedroom where Jayla was sleeping. R.L. then heard "thumping noises," but he assumed that LaCresha was playing with a ball and told her to stop. Shortly after that, LaCresha told R.L. that Jayla was throwing up and shaking. He asked her to bring Jayla to the front of the house, where he observed that Jayla appeared ill. He told Lacresha to take Jayla outside to warm her up.

At 5:00 p.m., another parent arrived to collect her children and noticed that Jayla was sweating profusely. That parent urged R.L. to call 911, but he declined to do so. R.L. took Jayla to the hospital, however; she was pronounced dead at approximately 5:30 p.m.

An autopsy conducted the following day revealed that Jayla had suffered a severe liver injury caused by a blunt blow to the abdomen. This trauma had broken four of her ribs and split her liver into two pieces. The medical examiner concluded that Jayla had died within five to fifteen minutes after receiving the injury and also noted some thirty other bruises to her head, ear, forehead, back, shoulder, elbow, chest, and the left side of her torso. The examiner ruled Jayla's death a homicide.

That same day, law-enforcement authorities removed all the children from the Murray home. They placed LaCresha and one of her sisters in Texas Baptist Children's Home, a private shelter for children which contracts with the State to provide foster care. At

the time that these children were removed from their adoptive parents' home, the authorities believed that they were in danger. There is some dispute as to exactly when the police first began to suspect that LaCresha had killed Jayla, but the focus of the investigation had quickly shifted to LaCresha after law-enforcement authorities spoke with other members of the household.

Three days after LaCresha had been removed from her adoptive parents' home, Detective Reveles directed Detectives Pedraza and Eels, along with Angela McGown, the supervisor of the Travis County Child Protective Services, to interview LaCresha. It is undisputed that, by this time, the police no longer feared for LaCresha's safety but instead considered her a suspect in Jayla's death.

Before the interview of LaCresha, Detectives Reveles and Pedraza consulted with assistant district attorney Emmons on the proper method of interrogating LaCresha. Emmons testified that, even though LaCresha had been at the Texas Baptist Children's Home for three days, none of the officials believed that she was in the custody of the State. In their minds, this obviated the need for them to take her before a magistrate, as required by Texas law for children who are in state custody. Pedraza and Eels gave LaCresha a Miranda warning before beginning to interrogate her, but they did not take her before a magistrate or notify her parents or attorney.

The detectives questioned LaCresha at the Baptist Children's Home for approximately two hours, eventually eliciting a confession

4

that she had dropped Jayla and kicked her. The State then charged her with capital murder and injury to a child; the juvenile court ruled her confession admissible; and the jury convicted her of negligent homicide and injury to a child. Extensive publicity followed, presumably influencing the juvenile court to order a new trial on its own motion. At the second trial, the State charged LaCresha with injury to a child; her confession was again admitted; and the second jury convicted her. The juvenile court adjudicated LaCresha delinquent and sentenced her to twenty-five years in the custody of the Texas Youth Commission.

Three years later, the Texas Court of Appeals reversed LaCresha's conviction.[2] The appellate court ruled that LaCresha had been in the custody of the State, that law-enforcement authorities had violated Texas law by not taking her before a magistrate prior to interrogating her, and that her confession was therefore inadmissible.[3]

LaCresha then brought suit in district court for damages against numerous individuals, some of whom were only tangentially related to the LaCresha's judicial proceedings, asserting various violations of her constitutional and state rights. On motions for summary judgment, the district court dismissed all her claims except those against the Defendants⸺Appellants (collectively, "the

---

[2] In re L.M., 993 S.W.2d 276, 291 (Tex. App. – Austin 1999, pet. denied).

[3] Id.

defendants") for violations of her Fifth Amendment right against self-incrimination and for state law civil conspiracy. The defendants now appeal the denial of their summary judgment motions for qualified immunity on LaCresha's Fifth Amendment claims and for official immunity under state law on her civil conspiracy claims.

We have jurisdiction over both appeals. A defendant may immediately appeal the denial of qualified immunity, even though it is not a "final decision" under 28 U.S.C. § 1291.[4] The Texas law of official immunity provides the same protection against both suit and liability as does the federal doctrine, so we also have jurisdiction to review denial of state law immunity claims on interlocutory appeal.[5]

## II.    ANALYSIS

A.    Standard of Review

We review denials of grants of summary judgment de novo.[6] Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law.[7] We construe all facts and inferences in the light most favorable to the nonmoving party when reviewing grants

---

[4] Mitchell v. Forsyth, 472 U.S. 511, 524-25 (1985).

[5] Roe v. Tex. Dep't of Protective & Regulatory Servs., 299 F.3d 395, 413 (5th Cir. 2002).

[6] Tex. Med. Ass'n v. Aetna Life Ins. Co., 80 F.3d 153, 156 (5th Cir. 1996).

[7] Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

of motions for summary judgment.[8]

B.    Fifth Amendment Violation: Qualified Immunity

In undertaking a qualified immunity analysis, we must first determine whether the plaintiff has suffered a violation of his constitutional rights and, if so, whether a reasonable official should have known that he was violating the plaintiff's constitutional rights.[9]  The district court held that, under these narrow circumstances —— an eleven-year-old child is removed from her home, housed at a private shelter by the State for three days, interrogated there for hours by two seasoned investigators to the point of confession without an adult or advocate present to represent her interests, and is convicted largely on the strength of that confession —— the child may, after the conviction is overturned on the grounds that the confession was inadmissible, sue under § 1983 for damages she suffered as a result of the violation of her constitutional rights.[10]  On appeal, the defendants insist

---

[8] Hart v. O'Brien, 127 F.3d 424, 435 (5th Cir. 1997), cert denied, 5525 U.S. 1103 (1999).

[9] Hope v. Pelzer, 536 U.S. 730, 736, 739 (2002).  Defendants Emmons and Blazey are each prosecuting attorneys in Travis County, however, they are entitled to claim only qualified immunity rather than the absolute immunity normally enjoyed by prosecutors.  LaCresha is suing them for the legal advice which they provided the police investigators, for which they are not entitled to absolute immunity. See Burns v. Reed, 500 U.S. 478, 496 (1992)(holding that absolute immunity does not protect the prosecutorial function of giving advice to the police).

[10] LaCresha spent three years in juvenile detention as a result of her conviction.

that, even if LaCresha's right against self-incrimination was violated, § 1983 does not, or at least should not, provide her with a remedy. We hold that, because LaCresha cannot demonstrate that defendants acted unreasonably, in that their actions did not proximately cause the damages that she suffered, she may not maintain a Fifth Amendment cause of action against them under § 1983.

1.   Constitutional Violation

It is axiomatic that a criminal defendant's constitutional rights have been violated "if his conviction is based, in whole or in part, on an involuntary confession, regardless of its truth or falsity."[11]   The Fifth Amendment privilege against self-incrimination is a fundamental trial right which can be violated only <u>at</u> trial, even though pre-trial conduct by law enforcement officials may ultimately impair that right.[12]   The constitutional privilege against self-incrimination adheres in juvenile court proceedings just as it does in ordinary criminal court.[13]   In fact,

_____

[11] <u>Miranda v. Arizona</u>, 384 U.S. 436, 465 n.33 (1966).  The Supreme Court has held that § 1983 plaintiffs do not have a Fifth Amendment claim against law-enforcement officials who have elicited unlawful confessions if those confessions are not then introduced against the plaintiffs in criminal proceedings.  This case is distinguishable, as LaCresha's statement was admitted at trial and did result in her conviction.  <u>See</u> <u>Chavez v. Martinez</u>, 538 U.S. 760 (2003).

[12] <u>Chavez</u>, 538 U.S. at 767; <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 264 (1990)(internal citations omitted).

[13] <u>In re Gault</u>, 387 U.S. 1, 30-31, 55 (1967).

8

states must take greater care to protect juveniles against coerced confessions during police interrogations, because children are more likely to be induced to confess, and their confessions are less likely to be reliable.[14]

     a.   Custodial Interrogation

An individual's Fifth Amendment right against self-incrimination is implicated only during a "custodial" interrogation.[15] The Supreme Court defines "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody."[16] A suspect is "in custody" for these purposes either (1) when he is formally arrested or (2) "when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest."[17] We review de novo the question whether an

---

[14] Id. at 55. "[A]uthoritative opinion has cast formidable doubt upon the reliability and trustworthiness of 'confessions' by children." Id. at 52.

[15] See Illinois v. Perkins, 496 U.S. 292, 296 (1990)(citing Miranda, 384 U.S. at 444); United States v. Gonzales, 121 F.3d 928, 939 (5th Cir. 1997)("It is axiomatic that 'the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning.'")(quoting Perkins, 496 U.S. at 296).

[16] Gonzales, 121 F.3d at 939 (5th Cir. 1997)(citing Perkins, 496 U.S. at 296)(internal quotations omitted).

[17] Gonzales, 121 F.3d at 940 n.6 (citing United States v. Galberth, 846 F.2d 983, 986 n.1 (5th Cir. 1988) and United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir.)(en banc), cert

interrogation was custodial.[18]

The district court relied heavily on the reasoning of the Texas Court of Appeals in determining whether LaCresha was in the custody of the State during her interrogation. The Texas appellate court's initial determination whether LaCresha was in custody, though addressing the federal constitutional standard for "custodial interrogations," was undertaken solely for the purposes of the Texas law requiring that, if so, she should have been taken before a magistrate before the police questioned her.[19] This inquiry is apposite but not determinative of our de novo federal constitutional inquiry regarding "in custody," i.e., whether a reasonable person in LaCresha's position would have understood that his liberty was constrained to the extent associated with formal arrest.

On the latter issue, the Texas appellate court held, in contrast to the Texas trial court, that LaCresha's interrogation was custodial, adopting and applying a "reasonable child" standard. The court asked whether, under these circumstances, a reasonable child of eleven would have believed that her freedom of movement

---

denied, 488 U.S. 924 (1988)).

[18] United States v. Paul, 142 F.3d 836, 843 (5th Cir. 1998).

[19] Texas law requires that a child be taken before a magistrate before interrogation if the child is in a detention facility or other place of confinement. Tex. Fam. Code. § 51.095(d)(1).

was constrained to the degree associated with formal arrest.[20] The appellate court emphasized that LaCresha was involuntarily removed from her home by the State and placed in a children's shelter pursuant to emergency provisions of section 262 of the Texas Family Code.[21] The state appellate court agreed with the state trial court that, for purposes of evaluating whether LaCresha was "in custody" for purposes of Texas state law, the Texas Baptist Children's home was not a jail or detention facility.[22] The appellate court diverged from the trial court, however, in ruling that (1) because the shelter assumed all duties of care and control over children residing there, it was a place of confinement; and (2) practically speaking, LaCresha was not free to leave, as she would have had to "run away" from the shelter, and she had no means of returning to her home.[23] Although the determination that the shelter was a "place of confinement" under Texas state law is not directly relevant to the question whether LaCresha was in custody during the ensuing interrogation, the state appellate court's underlying determinations regarding the degree of restriction over LaCresha's movement imposed by the state is relevant to whether she would have

---

[20] In re L.M., 993 S.W.2d 276, 289 (Tex. App. —— Austin, 1999, pet. denied).

[21] Id.

[22] See Tex. Fam. Code. § 51.095(d)(1).

[23] In re L.M. 993 S.W.2d 276, 289 (Tex. App. —— Austin, 1999, pet. denied).

felt her liberty to be constrained.

The defendants protest that we ought not consider a suspect's age in evaluating whether he was "in custody" for purposes of a Fifth Amendment violation. Rather, they assert, we must use an objective test, asking only whether a reasonable <u>person</u>, not a reasonable <u>child</u>, would have concluded that his liberty was constrained.[24] The Supreme Court has endorsed this approach when confronted with an interrogation of a seventeen-year-old suspect, but the Court's conclusion rested on the assertion that the "custody inquiry states an objective rule designed to give clear guidance to the police, while consideration of a suspect's individual characteristics — including his age — could be viewed as creating a subjective inquiry."[25] Justice O'Connor wrote separately to emphasize that "[t]here may be cases in which a suspect's age will be relevant to the <u>Miranda</u> 'custody' inquiry" but that in <u>Yarborough</u>, the defendant was almost eighteen years old and it would be difficult "to expect police to recognize that a suspect is a juvenile when he is so close to the age of majority."[26]

The case of an eleven-year-old is different. The police should have no difficulty recognizing that their suspect is a juvenile and adjusting their determination whether the suspect

---

[24] <u>See</u> <u>United States v. Gonzales</u>, 121 F.3d 928, 940 n.6 (5th Cir. 1997)(citations omitted).

[25] <u>Yarborough v. Alvarado</u>, 124 S. Ct. 2140, 2151-52 (2004).

[26] <u>Yarborough</u>, 124 S.Ct. at 2152 (O'Connor, J., concurring).

12

would understand his freedom of movement to be constrained accordingly. In any event, even if we were to ignore LaCresha's age at the time of her interrogation, we would still conclude that a reasonable individual of any age who is removed involuntarily from his home, housed by the State for three days, not informed that he is free to leave, and questioned by two police detectives in a closed interrogation room, would believe that his liberty was constrained to the degree associated with formal arrest.[27] We hold that LaCresha was "in custody" for purposes of evaluating her interrogation.

### b. Involuntary Confession

Next, we must determine whether the statement that LaCresha gave while in custody was involuntary, making its introduction at her criminal trial violative of her Fifth Amendment rights. Although LaCresha's statement was taken in violation of Texas law, this alone did not automatically produce a violation of her Fifth

---

[27] See United States v. Collins, 972 F.2d 1385, 1405 (5th Cir. 1992)("[T]he most obvious and effective means of demonstrating that a suspect has not been taken into custody 'is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.'")(citing United States. v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)); United States v. Harrell, 894 F.2d 120, 124 n.1 (5th Cir. 1990)("We agree with the defendant that a detention of approximately an hour raises considerable suspicion," though declining to establish a bright-line rule for when a suspect's interrogation becomes custodial); United States v. Bengivenga, 845 F.2d 593, 600 (5th Cir. 1988)(holding that 90-second, routine citizenship check at Mexican border did not constitute custodial interrogation). Here, the act of the police in administering a Miranda warning should confirm their own belief that LaCresha was in custody.

Amendment rights.[28]  Once we have concluded that a juvenile's interrogation was custodial, we determine whether such a suspect's confession is coerced or involuntary by examining the totality of the circumstances surrounding the child's interrogation.[29]  In addition to the fact that the interrogation was conducted in violation of state law, our examination includes consideration of the juvenile's "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."[30]  The Supreme Court has admonished that the police are required to take special care to ensure the voluntariness of a minor suspect's confession:

> If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.[31]

---

[28] See Gagne v. City of Galveston, 805 F.2d 558, 560 (5th Cir. 1986);  United States v. Wilderness, 160 F.3d 1173, 1175 (7th Cir. 1998)("Indiana would not have permitted [the juvenile plaintiff's] confession to be used in a state prosecution. . . But . . .the voluntariness of a confession depends on public officials' compliance with constitutional norms, not on any rule of state law.").

[29] Fare v. Michael C., 442 U.S. 707 (1979); Gachot v. Stadler, 298 F.3d 414, 418 (5th Cir. 2002).

[30] Fare, 442 U.S. at 725; Gachot, 298 F.3d at 418-19 (quoting Fare, 442 U.S. at 725).

[31] In re Gault, 387 U.S. 1, 55 (1967).

14

Every factor weighed in our analysis militates against the conclusion that LaCresha's statement was voluntary. At eleven years of age, she was far younger than the fifteen-year-old juvenile suspect whom we held to have voluntarily confessed in Gachot v. Stadler.[32] She had no experience with the criminal justice system, had been held in the custody of the State for three days, was unaccompanied by any parent, guardian, attorney, or other friendly adult, and was found to have below-normal intelligence by the court-appointed psychiatrist prior to her criminal trial, also in contrast to the Gachot defendant.[33]

LaCresha cannot be held to have knowingly and voluntarily waived her rights to be represented by counsel and to remain silent.[34] Other than having LaCresha sign a Miranda card, and

_____

[32] 298 F.3d at 416, 421.

[33] Id. (noting that the defendant was accompanied by his brother during the interrogation, voluntarily went to the police station for questioning, and was there for approximately four hours). Compare Fare, 442 U.S. at 726-27 (holding 16 1/2 year-old juvenile voluntarily and knowingly waived his Fifth Amendment rights during an interrogation as he had considerable experience with the police, having a record of several arrests, sufficient intelligence to understand the rights he was waiving, and was not worn down by improper interrogation tactics or lengthy questioning by trickery or deceit) with Haley v. Ohio, 332 U.S. 596 (1948) (holding that a 15-year-old who had been arrested at midnight, taken to a police station and subjected to continuous interrogation by a rotation of several police officers, without counsel or friend, until he confessed to participating in a robbery and shooting, had not voluntarily confessed).

[34] See E.A.W. v. State, 547 S.W.2d 63, 64 (Tex. Civ. App. — Waco 1977, no writ)(holding that an eleven-year-old child cannot knowingly, intelligently, and voluntarily waive her

15

briefly explaining her rights to her at the outset of the interrogation, the police took no precautions to ensure the voluntariness of her statement, let alone "special care." The police made no effort to contact LaCresha's adoptive parents, and the shelter, which had assumed responsibility for her care, sent no representative with her to the interrogation. LaCresha was never told that she was free to leave or that she could call her adoptive parents or any other friendly adult. In addition, the police officers represented to LaCresha that they had already talked to everyone in her family, that everyone "knew" what happened, and that she could help her family only by telling the truth. We hold that LaCresha's statement was involuntary, and that its admission at trial violated her Fifth Amendment right against self-incrimination.

2. Clearly Established Law

To overcome a claim of qualified immunity, a plaintiff must establish that the right an official is alleged to have violated was "clearly established," i.e., sufficiently clearly defined that "a reasonable official would understand that what he is doing violates that right."[35] Although there need not be prior case law directly on point for a constitutional right to be clearly

constitutional privilege against self-incrimination after spending nine hours, from midnight to nine a.m., in a detention facility, and without the guidance of a parent, guardian or attorney).

[35] Anderson v. Creighton, 483 U.S. 635, 640 (1987).

16

established, the state of the law must be such that a reasonable officer would be on notice that his actions could violate a constitutional right.[36] Defendants argue that, even assuming arguendo that clearly established law should have put them on notice that their interrogation of LaCresha was custodial and that her statement was not made voluntarily, no clearly established law put them on notice that their actions could violate her Fifth Amendment rights.

Defendants assert that a reasonable officer would not have understood that his actions could have violated LaCresha's Fifth Amendment rights because, as we discussed above, such a violation requires that (1) officials coerce an involuntary statement from a suspect and (2) this statement later be introduced against her at trial.[37] Therefore, because an officer cannot contemporaneously interrogate a suspect unlawfully and violate a suspect's Fifth Amendment rights, we must determine whether clearly established law should have alerted a reasonable official that his pre-trial conduct, although perhaps a but-for cause of the violation of the plaintiff's trial rights, could proximately cause a violation of her Fifth Amendment rights.

In a perfect world, trial courts protect defendants' Fifth Amendment rights by excluding improperly obtained confessions or

---

[36] Hope v. Pelzer, 536 U.S. 730, 741 (2002).

[37] See Chavez v. Martinez, 538 U.S. 760, 770 (2003).

17

statements.[38]  In this real-world case, however, the trial court failed to protect LaCresha's rights.  It is true that the officers wrongfully elicited LaCresha's confession during her interrogation and that this confession was later wrongfully admitted at trial and used against her, and ultimately resulted in her conviction; yet a trial judge twice heard all the evidence concerning the circumstances surrounding LaCresha's confession and twice admitted it into evidence.  The defendants thus insist that, inasmuch as the decision whether to admit a criminal defendant's statement lies within the discretion of the presiding judge at trial, that judge's decision to admit LaCresha's confession was an independent, superseding cause of the violation of her Fifth Amendment rights.[39]

---

[38] See Oregon v. Elstad, 470 U.S. 298, 307 (1985)(ruling that failure to Mirandize a witness before his confession automatically results in exclusion of the statement's use in the prosecution's case in chief); United States v. Blue, 384 U.S. 251, 255 (1966) ("Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial").

[39] See Crowe v. County of San Diego, 303 F. Supp. 2d 1050, 1091-92 (S.D. Cal. 2004).  The Crowe court also observed that it would be unfair to subject to civil liability under § 1983 only those police officers whose improper questioning produced statements admitted at trial but exonerate those officers whose questioning violated defendants' civil rights more egregiously, resulting in statements excluded by the trial court.  303 F. Supp. 2d at 1092.  We find this logic unpersuasive, as defendants abused by the police during their interrogations may bring suit for violation of their Fourteenth Amendment rights. See Chavez, 538 U.S. at 773-74; Rex v. Teeples, 753 F.2d 840, 843 (10th Cir. 1985)("Extracting an involuntary confession by coercion is a due process violation.")(citing Haynes v. Washington, 373 U.S. 503, 513-15) (1963) and Spano v. New York, 360 U.S. 315, 320-23

18

Therefore, contend the defendants, because their improper questioning could not have caused the violation of LaCresha's Fifth Amendment rights, they should not be held liable for the violation.[40]

Section 1983 does require a showing of proximate causation, which is evaluated under the common law standard.[41] In cases like this one, we read § 1983 against the background of tort liability that makes a person liable for the natural consequences of his actions.[42] A corollary of these background tenets of tort law

_____

(1959)); <u>Duncan v. Nelson</u>, 466 F.2d 939, 944-45 (7th Cir.), <u>cert. denied</u>, 409 U.S. 894 (1972).

[40] The defendants argue that the presiding judge or prosecutor is responsible and therefore liable for the constitutional violation; but, of course, judges and prosecutors enjoy absolute immunity for their judicial decisions and prosecutorial functions, respectively. <u>Stump v. Sparkman</u>, 435 U.S. 349, 356-57 (1978); <u>Imbler v. Pachtman</u>, 424 U.S. 409, 420 (1976). Whether an objectively reasonable officer could be aware, as he was improperly obtaining a suspect's statement, that he could be violating that individual's <u>Fourteenth</u> Amendment substantive due process rights is a separate question that we do not address, as LaCresha did not allege a violation of her Fourteenth Amendment rights. <u>See</u> <u>Chavez</u>, 538 U.S. at 773 (2003)("Our views on the proper scope of the <u>Fifth Amendment's Self-Incrimination Clause</u> do not mean that police torture or other abuse that results in a confession is constitutionally permissible so long as the statements are not used at trial; it simply means that the <u>Fourteenth Amendment's Due Process Clause</u>, rather than the <u>Fifth Amendment's Self-Incrimination Clause</u>, would govern the inquiry in those cases and provide relief in appropriate circumstances.")(emphasis in original).

[41] <u>Sims v. Adams</u>, 537 F.2d 829, 831 (5th Cir. 1976).

[42] <u>Monroe v. Pape</u>, 365 U.S. 167, 187 (1961), <u>over-ruled on other grounds</u>, <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978)(holding that plaintiffs may sue municipalities for civil rights violations using § 1983).

19

relieves tortfeasors from liability if there exists a superseding cause, or "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent wrongful act was a substantial factor in bringing about."[43]  Defendants advance that the trial judge's decision to admit LaCresha's statement into evidence constitutes such a superseding cause, and that, absent any allegation or proof that they endeavored to mislead the judge into admitting an involuntary statement at trial, they cannot have acted "unreasonably" according to clearly established law for purposes of § 1983 liability.

Albeit in dicta, the Supreme Court has intimated that this argument should not hold sway, at least with respect to false arrest claims.  Although the Court in <u>Malley v. Briggs</u> conceded that the appellant police officer's argument that he could not have proximately caused a defendant's unlawful arrest by filing an affidavit unsupported by probable cause was not before it on appeal, the Court stated that it would not have been receptive to this contention.[44]  <u>Malley</u> states that § 1983 should be read against background tort law, which recognizes the liability of individuals for the consequences of their acts:

>     Petitioner has not pressed the argument that in
> a case like this the officer should not be liable

---

[43] Restatement 2d of Torts § 440-41 (1965).

[44] 475 U.S. 335, 345 n.7 (1986).

because the judge's decision to issue the warrant breaks the causal chain between the application for the warrant and the improvident arrest. It should be clear, however, that the District Court's "no causation" rationale in this case is inconsistent with our interpretation of § 1983. As we stated in Monroe v. Pape, 365 U.S. 167, 187 (1961), § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.[45]

One year after Malley, we implicitly endorsed this approach in United States v. Burzynski Cancer Research Institute, holding that Malley required us to reject a police officer's "superseding cause" arguments and examine only whether a reasonably well-trained officer would have known that his warrant application was unsupported by probable cause.[46] The following year, however, we decided Gary v. Hand, a false arrest case in which we held that, when a neutral intermediary, such as a justice of the peace, reviews the facts and allows a case to go forward, such an act "breaks the chain of causation."[47] We qualified our holding by stating that "the chain of causation is broken only where all the facts are presented to the grand jury, or other independent intermediary where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary."[48] This holding in Gary was

---

[45] Malley, 475 U.S. at 345 n.7.

[46] 819 F.2d 1301, 1309 (5th Cir. 1987).

[47] Gary v. Hand, 838 F.2d 1420, 1428 (5th Cir. 1988).

[48] Id. at 1427-28.

21

consistent with other circuit precedent,[49] yet we made no mention of Burzynski or of the Supreme Court's "proximate cause" footnote in Malley.

The rule of Gary v. Hand has since prevailed in this circuit for almost two decades.[50] Even though Burzynski appears to contradict Hand's holding on the issue of superseding cause, the earlier decision did not address the issue in depth, and we are unwilling to disregard firmly ensconced circuit precedent in favor of such a cursory analysis of Malley's dicta. A review of other circuits' case law addressing proximate cause when a plaintiff's

---

[49] See Thomas v. Sams, 734 F.2d 185, 191 (5th Cir. 1984) (holding a mayor who had falsely sworn an arrest warrant, then submitted the warrant to himself, as a magistrate, for issuance, did not break the chain of causation because he did not submit the warrant to a neutral party); Smith v. Gonzales, 670 F.2d 522, 526 (5th Cir. 1982) (holding that an officer who acted with malice in procuring a warrant or a indictment will not be liable if the facts supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's 'independent' decision 'breaks the causal chain' and insulates the initiating party); Rodriquez v. Ritchey, 556 F.2d 1185, 1193 (5th Cir. 1977)(en banc), cert. denied, 434 U.S. 1047 (1978).

[50] See Shields v. Twiss, 389 F.3d 142, 150 (5th Cir. 2004)("[O]nce facts supporting an arrest are placed before an independent intermediary such as a . . . grand jury, the intermediary's decision breaks the chain of causation". . .unless "the deliberations of that intermediary were in some way tainted by the actions of the defendants")(internal citations omitted); Gordy v. Burns, 294 F.3d 722, 728 (5th Cir. 2002)(reaffirming Hand); Taylor v. Gregg, 36 F.3d 453, 456 (5th Cir. 1994)("It is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party.")(citations omitted).

22

injury results from an independent decision-maker's ruling also reveals a fundamental tension between these primary tenets of tort law: (1) An individual is liable for the reasonably foreseeable consequences of his actions, and (2) an intervening decision of an informed, neutral decision-maker "breaks" the chain of causation.[51]

---

[51] Compare Kerman v. City of New York, 374 F.3d 93, 126 (2d Cir. 2004)(holding that police officer could be held liable for plaintiff's loss of liberty after police officer wrongly sent plaintiff to a mental hospital, even though the plaintiff's subsequent detention in the hospital resulted from the independent judgment of the physicians. "Tort defendants, including those sued under § 1983, are responsible for the natural consequences of their actions.")(citing, inter alia, Malley v. Briggs, 475 U.S. 335 (1986)); Herzog v. Village of Winnetka, 309 F.3d 1041, 1044 (7th Cir. 2002)("[T]he ordinary rules of tort causation apply to constitutional tort suits" after a suspect was illegally forced to give blood and urinate as a result of an illegal arrest)(internal citation omitted); Zahrey v. Coffey, 221 F.3d 342, 352 (2d Cir. 2000)("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."); Warner v. Orange County Dep't of Probation, 115 F.3d 1068, 1072-73 (2d Cir. 1996)(concluding that, as a sentencing judge's adoption of probation officers' recommendation was entirely foreseeable, the judge's decision did not break the chain of causation with respect to the probation officers' liability under § 1983); and Buenrostro v. Collazo, 973 F.2d 39, 45 (1st Cir. 1992)(holding that, as "the Supreme Court has made it crystal clear that principles of causation borrowed from tort law" apply to constitutional torts, a jury "could conceivably find a causal nexus between [an] unlawful arrest and [a] consequent imprisonment," even after an independent magistrate determined that there was probable cause to detain the plaintiff)(citing Malley, 475 U.S. at 345 n.7) with Egervary v. Young, 366 F.3d 238, 248 (3d Cir. 2004)("To the extent that the common law recognized the causal link between a complaint and the ensuing arrest, it was in the situation where "misdirection" by omission or commission perpetuated the original wrongful behavior.")(citing Hand, 838 F.2d at 1428); Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999)(holding chain of causation broken between police officers' illegal search and seizure and

23

In this circuit, it was not well-established at the time of LaCresha's interrogation that an official's pre-trial interrogation of a suspect could subsequently expose that official to liability for violation of a suspect's Fifth Amendment rights at trial. We hold that, as in the analogous context of Fourth Amendment violations, an official who provides accurate information to a neutral intermediary, such as a trial judge, cannot "cause" a subsequent Fifth Amendment violation arising out of the neutral intermediary's decision, even if a defendant can later demonstrate that his or her statement was made involuntarily while in custody.[52]

LaCresha has not identified, and we have not found, any evidence in the record to indicate that the state judge who

plaintiff's subsequent conviction and imprisonment); Smiddy v. Varney, 665 F.2d 261, 266-68 (9th Cir. 1981)(holding police officers not liable for damages once prosecutor made independent decision to charge plaintiff); Duncan v. Nelson, 466 F.2d 939, 943 (7th Cir. 1972)(holding that no § 1983 cause of action exists for violation of Fifth Amendment rights resulting from admission into evidence of a coerced confession as officers did not proximately cause the violation); Crowe v. County of San Diego, 303 F. Supp.2d 1050, 1092 (S.D. Cal. 2004) ("Given the roles and obligations of prosecutors and judges and the independent nature of these positions, a police officer could not reasonably know that by obtaining a coerced confession he will cause a prosecutor and/or a trial judge to violate a defendant's Fifth Amendment privilege against self-incrimination."). See also Hector v. Watt, 235 F.3d 154, 161 (3d Cir. 2000)(declining to reach the question of whether proximate cause prevented a § 1983 plaintiff from suing police officers for fabricating evidence as "there is a great deal of tension in the caselaw about when official conduct counts as an intervening cause.").

[52] We emphasize again that our analysis does not apply to Fourteenth Amendment claims brought by plaintiffs against officials that attack the lawfulness of the interrogation itself. See Chavez v. Martinez, 538 U.S. 760, 773-74 (2003).

24

presided over her juvenile trial failed to hear (or was prevented from hearing) all of the relevant facts surrounding her interrogation before deciding to admit her confession into evidence. Armed with all those facts, that judge nevertheless concluded that LaCresha was not "in custody" for purposes of <u>Miranda</u> or Texas law governing the interrogation of minors, and ruled that her statement to the police was voluntary and admissible.[53] Like the state appellate court, we disagree with the trial court's ruling, yet we are constrained to hold that it constituted a superseding cause of LaCresha's injury, relieving the defendants of liability under § 1983. This holding pretermits our consideration whether she suffered a violation of a constitutional right that was clearly established at the time, and whether a reasonable official should have known that he was violating that right. Accordingly, we reverse the district court's denial of qualified immunity for the defendants on LaCresha's Fifth Amendment claim.

C. State Law Civil Conspiracy Claim

LaCresha has also asserted a claim under state law, contending that the defendants conspired to deprive her of her Fifth Amendment rights. The elements of a civil conspiracy claim in Texas are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more

---

[53] <u>In re L.M.</u>, 993 S.W.2d 276, (Tex. App.- Austin, 1999)(pet. denied).

unlawful, overt acts; and (5) damages as the proximate result."[54] A plaintiff asserting such a claim must prove that the defendants conspired to accomplish an unlawful purpose or used unlawful means to accomplish a lawful purpose.[55]

The defendants counter that, under Texas law, they are officially immune from suit for civil conspiracy.[56] In this interlocutory appeal, we have jurisdiction to hear the defendants' claim of official immunity because Texas law, like the federal doctrine, "provides a true immunity from suit and not a simple defense to liability."[57] As official immunity is thus an affirmative defense, a state official seeking summary judgment on such grounds "must conclusively prove each element of the defense."[58]

---

[54] Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983).

[55] Juhl v. Airington, 936 S.W.2d 640, 644 (Tex. 1996).

[56] As the Texas Tort Claims Act does not waive the State's immunity for civil conspiracy suits or other intentional torts committed by officials in their official capacity, the district court correctly dismissed claims brought against the defendants in their official capacities. TRST Corpus, Inc. v. Financial Ctr., Inc., 9 S.W.3d 316, 322 (Tex. App. – Houston [14th Dist.] 1999, writ denied)(citing Tex. Civ. Prac & Rem. Code § 101.021 (2004), which enumerates the causes of action for which the state has waived immunity, but not including civil conspiracy). Accordingly, we address only state conspiracy claims brought against the defendants in their individual capacities.

[57] Roe v. Tex. Dep't of Protective & Regulatory Servs., 299 F.3d 395, 413 (5th Cir. 2002).

[58] Univ. of Houston v. Clark, 38 S.W.3d 578, 580 (Tex. 2000).

26

Government officials in Texas are officially immune from liability for the performance of their (1) discretionary duties (2) in good faith (3) as long as they are acting within the scope of their authority.[59]  A discretionary function — as distinguished from a ministerial duty, which requires rote obedience to orders or performance of a function to which the actor has no choice — involves personal deliberation, decision and judgment.[60]  An officer acts in good faith if a reasonably prudent officer, under the same circumstances, <u>could</u> have believed that his actions were correct.[61] An officer acts within the scope of his authority when he discharges the duties generally assigned to him.[62]

 The district court ruled, and LaCresha does not dispute, that the remaining defendants were performing discretionary functions and acting within the scope of their authority vis-à-vis her interrogation.  That leaves only the question whether they acted in good faith.

To obtain official immunity on summary judgment, an official must prove that a reasonably prudent official might have believed that his action was appropriate under the circumstances.[63]  Even if

---

[59] <u>City of Lancaster v. Chambers</u>, 883 S.W.2d 650, 653 (Tex. 1994).

[60] <u>Id.</u> at 654 (citation omitted).

[61] <u>Id.</u> at 656.

[62] <u>Id.</u> at 658.

[63] <u>Id.</u>

an official's actions were taken negligently, that would not be sufficient to defeat a showing of good faith.[64] The test for good faith is objective and is substantially derived from the test for good faith in a qualified immunity claim for federal constitutional violations.[65]

In light of our holding that the defendants are immune from prosecution for LaCresha's Fifth Amendment constitutional claim because they did not act unreasonably according to clearly established law, we also determine, by conducting the analogous state law inquiry under Texas state law,[66] that immunity bars LaCresha's civil conspiracy claim. As we have now determined, for purposes of the Fifth Amendment inquiry, that the officers did not conceal from the Texas trial court any of the circumstances surrounding LaCresha's interrogation and, therefore, that they did not cause the violation of her rights, we are constrained to hold that they acted "in good faith" for purposes of Texas official immunity. A reasonable officer, under the circumstances, could have believed that what he was doing would not violate a suspect's Fifth Amendment rights — certainly, if none of the officials could cause a violation of those rights, none could conspire to cause such a violation, particularly in view of our determination that

_____

[64] Id. at 655.

[65] Roe v. Tex. Dep't of Protective & Regulatory Servs., 299 F.3d 395, 413 (5th Cir. 2002).

[66] See Chambers, 883 S.W.2d at 656.

28

the officials properly presented evidence of their interrogation of LaCresha to the Texas trial court.  Therefore, the defendants are entitled to immunity from LaCresha's state law conspiracy claim.

Further, our determination that the defendants did not commit an actionable violation with respect to LaCresha's Fifth Amendment violation bars a claim of civil conspiracy based on that violation, as "[g]enerally, if an act by one person cannot give rise to a cause of action, then the same act cannot give rise to a cause of action if done pursuant to an agreement between several persons."[67] Although LaCresha did suffer a violation of her constitutional rights, our determination that none of the state officials could have proximately caused this violation means that none have committed a tortious act.  As we conclude that LaCresha's claims against these defendants are unavailing, we reverse the district court, and remand for entry of summary judgment in favor of the defendants.

The importance of deterring the improper obtaining of confessions, however, cannot be gainsaid. "A deliberate, voluntary confession of guilt is among the most effectual proofs in the law, and constitutes the strongest evidence against the party making it that can be given of the facts stated in such confession."[68] Justice White called a voluntary confession the most damaging form

---

[67] <u>Kelly v. Diocese of Corpus Christi</u>, 832 S.W.2d 88, 95 (Tex. App. —— Corpus Christi 1992, writ dism'd w.o.j.).

[68] <u>Hopt v. Utah</u>, 110 U.S. 574, 584-85 (1884).

of evidence and noted that "[e]ven the testimony of an eyewitness may be less reliable than the defendant's own confession."[69] "Confession evidence (regardless of how it was obtained) is so biasing that juries will convict on the basis of confession alone, even when no significant or credible evidence confirms the disputed confession and considerable significant and credible evidence disconfirms it."[70]

A voluntary confession merits credence "because it is presumed to flow from the strongest sense of guilt."[71] In diametric opposition, an involuntary confession constitutes evidence entitled to little weight, as it is likely to be unreliable.[72]

---

[69] Bruton v. United States, 391 U.S. 123, 140 (1968) (White, J., dissenting).

[70] Stephen A. Drizin & Richard A. Leo, The Problem of False Confessions in the Post-D.N.A. World, 82 N.C.L. Rev. 891, 923 (2004). "Regardless of how often police elicit confessions from the innocent, the social science literature strongly suggests that interrogation-induced false confessions are highly likely to lead to the wrongful conviction of the innocent, perhaps more so than any other type of erroneous evidence. This is due to the strong effect that confession evidence exerts on the perceptions and decision-making of criminal justice officials and lay jurors. With the exception of being captured during the commission of a crime (whether by physical apprehension or electronically on videotape), a confession is the most incriminating and persuasive evidence of guilt that the State can bring against a defendant. It therefore stands to reason that with the exception of being falsely captured during the commission of a crime, a false confession is the most incriminating and persuasive false evidence of guilt that the State can bring against a defendant." Id. at 921.

[71] Hopt, 110 U.S. at 584.

[72] Jackson v. Denno, 378 U.S. 368, 385-86 (1964); In re Gault, 387 U.S. 1, 45 ("The principle, then, upon which a

> The privilege against self-incrimination is, of course, related to the question of the safeguards necessary to assure that admissions or confessions are reasonably trustworthy, that they are not the mere fruits of fear or coercion, but are reliable expressions of the truth. . .coercion is thought to carry with it the danger of unreliability.[73]

Involuntary confessions also affront society's "deep-rooted feeling that . . in the end, life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."[74]  These principles are doubly true in cases such as this one, in which the suspect is a young child whose statements are more likely to be the product of "fear, ignorance, fantasy, or despair."[75]

Nonetheless, the independent roles of police officers, prosecutors, and judges operate in this context to prevent individuals who have suffered violations of their Fifth Amendment rights from recovering for their damages, absent a showing that a neutral intermediary, such as a judge, did not have all pertinent information surrounding an interrogation before him when deciding a confession's admissibility.  Therefore summary judgment in favor of the defendants is appropriate.

---

confession may be excluded is that it is, under certain conditions, <u>testimonially untrustworthy</u>. . .")(emphasis in original)(quoting 3 Wigmore, Evidence § 822 (3d ed. 1940)).

[73] <u>In re Gault</u>, 387 U.S. at 47.

[74] <u>Spano v. New York</u>, 360 U.S. 315, 320-21 (1959).

[75] <u>In re Gault</u>, 387 U.S. at 55.

## III. CONCLUSION

As LaCresha cannot demonstrate that the acts of the defendants in obtaining her confession proximately caused the violation of her Fifth Amendment rights, we hold that she may not maintain against the defendants either a claim under § 1983 for a constitutional violation or civil conspiracy claim under Texas law.

REVERSED and REMANDED.