*306 OPINION OF THE COURT
Victor M. Ort, J.
In his omnibus motion, defendant John Kogut requested an order inter alia permitting him to introduce at trial expert testimony from one or more social psychologists concerning the psychological aspects of police interrogation techniques and the voluntariness of defendant’s confession. Alternatively, defendant requested a Frye hearing concerning the general acceptance of this novel scientific evidence in the relevant scientific community. By order dated December 1, 2004, the court granted a Frye hearing in order to determine whether the methodology of social psychology was generally accepted and whether the voluntariness of defendant’s confession was a proper subject of expert testimony. (See People v Kogut, 6 Misc 3d 1011[A], 2004 NY Slip Op 51775[U] [Sup Ct, Nassau County 2004].) The hearing was conducted on April 11, 12, May 17, 18, 19, 23, 24, June 20, 21, 22, 24, and July 21, 2005. Final submissions and the oral argument were conducted on September 8, 2005. The court notes that all four of the expert witnesses who testified, Dr. Saul Kassin, Dr. Richard Ofshe, Dr. Ebbe Ebbesen, and Dr. Solomon Fulero, are highly qualified in the field of social psychology. It was an absolute pleasure to hear them discuss their theories, research, and analysis. Every expert who testified acknowledged that the phenomenon of false confessions does exist.
Social Psychological Analysis
As Presented by the Defense
Dr. Kassin and Dr. Ofshe are both noted scholars and researchers in the field of social psychology.[1] The court will discuss first the analysis of Dr. Kassin. Dr. Kassin posited a “three-step process” in custodial interrogation by the police.[2] In the first step, referred to by Dr. Kassin as the “pre-interrogation interview,” the police investigator will interview the suspect in a noncoercive manner and form an initial judgment as to the *307 suspect’s truthfulness. If the investigator concludes that the suspect, by maintaining innocence, is attempting deception, the investigator will then proceed to the second step in the process, actual interrogation.
In the second phase, guilt is presumed, and the investigator engages in a variety of techniques designed to elicit an admission of guilt from the suspect. One such technique is “positive confrontation,” i.e., refusal by the investigator to accept the suspect’s denial of involvement. Another technique is “maximization,” a scare tactic in which the investigator overstates the seriousness of the offense and makes false or exaggerated claims about the available evidence of guilt. Alternatively, the investigator may engage in “minimization,” suggesting that the suspect’s role was relatively minor or morally justified and that leniency may be forthcoming. Additionally, the suspect may be deprived of basic physical needs such as food and sleep in order to render him more susceptible to influence and impair his decision-making ability and other cognitive functions. Finally, the suspect is isolated from the companionship of those likely to provide him with love and support in order to engender in him a state of hopelessness and despair. All of these various strategies become more effective when carried out over a prolonged period of time. Through the interplay of these various techniques, the suspect may develop a desire to “escape” from the situation of the interrogation room by giving his interrogators what they are seeking, namely, a confession. Because of “naivete” as to the workings of the criminal justice system, the suspect may even believe that despite his confession, his innocence may be established at a later time.
After the initial admission of guilt is obtained, the investigator will proceed to the third step which is to “convert” the bare admission to a “full narrative confession.” According to Dr. Kassin, it is useful to consider the detail and accuracy of the narrative confession because confessions which are demonstrably inaccurate are less likely to be voluntary. In analyzing the third step in the interrogation, Dr. Kassin considers the level of detail in the confession and whether the details are consistent with other evidence in the case. Dr. Kassin also looks to the source of those details which are accurate, theorizing that knowledge of details which could be known only by the perpetrator suggest guilt on the part of the defendant. On the other hand, knowledge of details which could be attributed to other sources, such as news reports or the investigators themselves, *308 yield little verification of the suspect’s guilt. Dr. Kassin refers to the extent to which the confession tends to corroborate guilt as its “diagnostic value,” and argues that a confession with low diagnostic value is more likely to have been coerced than obtained voluntarily.
Dr. Kassin buttresses his theory by relying on basic principles of psychology dealing with behavior, both positive and negative reinforcement, memory, and perception. Among the principles applied in Dr. Kassin’s analysis of police interrogation is the proposition that behavior is influenced more by perceptions of short-term than long-term consequences. Thus, according to Dr. Kassin, a suspect would tend to confess for the immediate gratification of terminating the interrogation and not consider the long-term effect of compromising his defense in the criminal case. Another principle is that people are susceptible to influence from social agents, or authority figures, and can be led to acts of conformity and compliance which are not in their best interest. Thus, according to Dr. Kassin, a suspect, innocent or guilty, might agree to confess to the crime simply to obtain favor with the investigator.
Through psychological experiments and studies, Dr. Kassin and others have developed a body of empirical data questioning the accuracy of an investigator’s assessment of the truthfulness of the suspect in the initial interview phase.[3] Dr. Kassin found that investigators could judge the truthfulness of a denial of guilt in only 50% of the cases.[4] As a result, according to Dr. Kassin, an investigator might shift from the preliminary interview to the interrogation phase without a significant basis for concluding that the suspect was in fact guilty.[5]
Dr. Kassin also confirmed through laboratory experiments that the behavior of the interviewer can influence the behavior *309 of the suspect. Through his experiments, Dr. Kassin claims to have replicated the phenomenon of a suspect falsely confessing to criminal activity. In Dr. Kassin’s study, a significant number of subjects confessed to a hypothetical “crime” which they had never committed in order gain a minor reward or avoid a minimal punishment. Based upon a review of the Huntley hearing conducted in March of 1986, the prior trial in May of that year, and various other documents, Dr. Kassin analyzed Mr. Kogut’s interrogation and concluded that his statement was involuntary. Dr. Kassin relied primarily on the length of the interrogation, 15 plus hours to produce the written statement, as well as the evidence that Mr. Kogut was deprived of food and sleep, was prevented from speaking with his girlfriend, may have been under the influence of alcohol and/or drugs, was confronted with persistent denials of his claim of innocence, and may have been misled as to the results of the lie detector test. Although Dr. Kassin did not examine Mr. Kogut to determine his susceptibility to police influence, he claimed that it was unnecessary to do so because the interrogation itself was so clearly coercive. Dr. Kassin has not expressed an opinion as to the truthfulness of Mr. Kogut’s confession.
The work of Dr. Ofshe is more in the nature of descriptive psychology. Dr. Ofshe has conducted case studies of actual interrogations by reviewing transcripts, videotapes, and audiotapes and interviewing people who were the subject of custodial interrogations. Through these various methods, Dr. Ofshe has studied over 300 police interrogations. Dr. Ofshe has attempted to develop a model of interrogation technique which he considers to be a form of “extreme influence.” In this regard, Dr. Ofshe’s analysis parallels in large measure that of Dr. Kassin.
Dr. Solomon Fulero, a psychologist and a licensed attorney, is a psychology professor at Sinclair Community College in Dayton, Ohio. Dr. Fulero was offered as a rebuttal witness by the defendant. Dr. Fulero has not done sufficient research in the area of false confessions to offer an opinion in his own right.
The People’s Witness
Dr. Ebbe Ebbesen, the People’s expert, is a professor of psychology at the University of California in San Diego. As noted above, Dr. Ebbesen recognized that the phenomenon of false confessions does exist even though it cannot yet be fully *310 quantified. Dr. Ebbesen stresses that social psychologists have not yet measured with mathematical precision the effect of any one factor, or combination of factors, on the probability that a suspect will confess.[6] Thus, Dr. Ebbesen urges a “representative design” approach, requiring that all of the variables contributing to the suspect’s decision to confess be fully correlated. Dr. Kassin, on the other hand, utilizes the “experimental design” technique, requiring only that individual variables be correlated with the confession.
The Law
The admissibility and bounds of expert testimony are matters addressed to the sound discretion of the trial court. (People v Cronin, 60 NY2d 430 [1983].) The court must consider whether jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and whether they would benefit from the specialized knowledge of an expert. (Id. at 433.) If the subject is a proper one for expert testimony, the trial court must also decide, as a matter of discretion, whether the expert may offer an opinion on the ultimate issue, in this case the voluntariness of the confession, or whether the expert may only describe the methodology and let the jury reach its own conclusion.
As early as Miranda v Arizona (384 US 436, 448 [1966]), it was recognized that “in-custody interrogation is psychologically rather than physically oriented . . . coercion can be mental as well as physical.” The Court of Appeals has also noted that the insights of social psychology are utilized by the police to obtain confessions and may be considered by the courts to determine whether the bounds of fundamental fairness have been breached. (People v Tarsia, 50 NY2d 1, 10 [1980].) In enacting the Criminal Procedure Law, our Legislature recognized that certain interrogation techniques, at least those involving promises or statements of fact, can create a substantial risk *311 that the defendant might falsely incriminate himself. (CPL 60.45 [2] [bj.)
The fact that psychological techniques of influence and persuasion have long been recognized by the courts suggests that such techniques are within the experience of lay jurors. Indeed, the court takes notice of the fact that the use of psychological techniques by interrogators is frequently described in the news and entertainment media. However, the fact that such techniques are within the experience of jurors does not resolve the more subtle question of whether expert psychological testimony may be adduced to aid the jury in reaching a conclusion as to the voluntariness of a confession.
In People v Lee (96 NY2d 157 [2001]), the Court of Appeals considered the admissibility of expert psychological testimony concerning the reliability of eyewitness identification. Defendant offered the testimony of a cognitive psychologist[7] who was prepared to testify as to the effects of the passage of time between the crime and the identification, the trauma of the crime itself, and the lack of correlation between the witness’ confidence and the accuracy of the identification. (96 NY2d at 162.) In Lee, the Court of Appeals cautioned trial courts to be wary not to exclude expert psychological evidence merely because, to some degree, it invades the jury’s province. The Court also noted that while jurors may be familiar from their own experience with factors relevant to the reliability of eyewitness identification, the average juror would not have been exposed to psychological studies regarding the accuracy of an identification. Thus, the Court held that the admissibility of such psychological testimony was within the discretion of the trial court, which should consider among other factors the centrality of the identification issue and the existence of corroborating evidence.
As noted, the fact that police officers use various psychological techniques to elicit confessions from suspects is within the ken of lay jurors. However, as with psychological studies regarding the accuracy of eyewitness identification, it cannot be said that the typical juror is familiar with psychological research concerning the voluntariness of confessions or the tendency of certain techniques to contribute to a false confession.
*312 While the question may be debated whether Dr. Kassin’s research with simulated criminals and investigators should be applied to any specific real life interrogation, the court concludes that Dr. Kassin’s analysis and methodology are generally accepted in the social psychology community. The fact that social psychology is not yet able to plot the curve showing the relationship between the decision to confess and the variables involved does not rebut the significance of Dr. Kassin’s findings. Indeed, the universal agreement that more research needs to be done based upon Dr. Kassin’s work confirms that his findings are generally accepted in the scientific community.
The application to permit testimony with respect to psychological studies concerning false confessions generally is not unlike that considered by the courts when the issue of rape trauma syndrome first arose. Evidence of a “syndrome,” or recognized pattern of behavior, including psychological reactions, if generally accepted within the relevant scientific community, may be admissible in order to dispel misconceptions that jurors might be expected to possess. (People v Taylor, 75 NY2d 277 [1990].) After analyzing the approaches taken by various other jurisdictions, a unanimous Court of Appeals held that “the reason why the testimony is offered will determine its helpfulness, its relevance and its potential for prejudice.” (Id. at 292.) In Taylor, the Court noted the popular misconception that a rape victim will always promptly report a rape. The Court found that expert testimony would aid a lay jury and allowed evidence of the general phenomenon of rape trauma syndrome to dispel this misconception and explain why a victim might delay in reporting the rape or naming her attacker. Similarly, jurors might be expected to assume that an innocent person will not confess to a crime he did not commit. Therefore, a study based upon generally accepted social psychology principles, establishing that the phenomenon of false confessions does occur, should be admissible to explain behavior that might appear unusual to a lay juror not familiar with the phenomenon.
Quite obviously, the voluntariness of Mr. Kogut’s confession is central to this case because of the absence of corroborating evidence other than the hair sample allegedly found in codefendant John Restivo’s vehicle.[8] In these circumstances, the court concludes, as a matter of discretion, that the nature of Dr. Kassin’s psychological studies on the voluntariness of confessions *313 generally and the phenomenon of eliciting false confessions will be admissible at trial. (See United States v Hall, 93 F3d 1337 [7th Cir 1996].) It will be for the jury to decide whether to accept Dr. Kassin’s analysis and whether it is sufficiently reliable to be applied to the facts in this case. (See 1 CJI[NY] 7.13, at 280.)
However, the court will not permit Dr. Kassin to offer any opinion on the ultimate issue, namely, whether John Kogut’s confession was in fact involuntary. The court notes in this regard that Dr. Kassin’s analysis, when applied directly to Mr. Kogut’s interrogation, takes on the form not of psychological research but rather purely legal argument. The risk of crossing the line from scientific study to legal advocacy may be inherent when research is conducted at the intersection of law and other disciplines. Nonetheless, the court cannot permit defendant to bolster his legal arguments as to psychological coercion merely by presenting them through an expert. (See, e.g. People v Ciaccio, 47 NY2d 431 [1979].)
With regard to Dr. Ofshe’s analysis, the court has no doubt that it is of value and interest to the academic community in the field of social psychology. However, the court is not convinced that Dr. Ofshe’s research or findings would be of assistance to a trial jury as far as determining the voluntariness of the defendant’s confession. Moreover, some of Dr. Ofshe’s analysis seems to be cumulative of Dr. Kassin’s. Thus, the court concludes that Dr. Ofshe’s testimony will not be admissible, except to the extent that his work may be referred to by Dr. Kassin.

. Dr. Kassin has conducted numerous studies and written a variety of articles in the interdisciplinary field of social psychology and the law, concentrating particularly on the psychological aspects of confession evidence. Dr. Ofshe has done extensive work in the area of influence and decision making particularly in the area of police interrogation.

. Although there was no evidence that Detective Volpe and Detective Gruber actually used the three-step interrogation process assumed by Dr. Kassin, lack of proof in this regard affects only the basis for his opinion and the weight, if any, to be given to his testimony. (Cf. People v Jones, 73 NY2d 427, 430 [1989].)

. Although investigators had difficulty distinguishing true and false denials of guilt, they had a significantly higher level of confidence in their judgments than did nonprofessionals in law enforcement.

. Dr. Ebbesen argued that other studies show that in “high impact” cases, where the consequences for the suspect if the lie is detected are greater, the investigator may have a better ability to determine truth from falsehood. While that may very well be, in the court’s view this qualification effects not the general acceptance of Dr. Kassin’s findings but only the weight to be given to his testimony. There need not be unanimous agreement among the experts for expert testimony to be admissible.

. The People’s expert, Dr. Ebbesen, observed that in many cases police will possess other evidence tending to show that the suspect is in fact guilty. In those cases, the investigator’s inability to determine true from false denials would be of less concern. Where, as in the present case, the independent evi *309 dence of guilt is not overwhelming, the investigator’s ability to judge a true or false denial of guilt becomes more significant.

. Among the difficulties, which Dr. Ebbesen recognized would have to be overcome in order to perform the research, is the need of an objective standard for determining guilt. Dr. Ebbesen suggested that DNA could be used as a means of determining whether the person who confessed was “the guy who did it” and thus whether the confession was truthful. However, by limiting the database of confessions to those in which the only issue in the case is the identity of the perpetrator, the researcher would be ignoring the host of cases in which the most significant issue is the defendant’s mental state. Finding an objective standard for determining mens rea is a problem which appears to still elude the scientific community. (Cf. People v Leone, 25 NY2d 511 [1969] [physiological responses not indicative of truth or lying].)

. Cognitive psychology is that branch of the discipline concerned with mental processes such as perception and memory, especially with respect to the internal events occurring between sensory stimulation and the overt expression of behavior. (Merriam-Webster’s Medical Desk Dictionary.)

. Whether the hair sample was actually found or was planted in the van is hotly contested by the parties. The forensic proof offered by defendant on *313 this issue, postmortem hair banding, is the subject of a separate Frye hearing to be conducted by the court.