# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 26, 2012

Lyle W. Cayce
Clerk

No. 10-60957

TYLER EDMONDS; SHARON CLAY,

Plaintiffs-Appellants,

versus

OKTIBBEHA COUNTY, MISSISSIPPI,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Mississippi

Before HIGGINBOTHAM, SMITH, and HIGGINSON, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Tyler Edmonds and his mother, Sharon Clay, sued Oktibbeha County, Mississippi, under 42 U.S.C. § 1983. Edmonds claimed county actors coerced a confession, and Clay claimed separation from her son while he was confessing. The district court entered summary judgment for the county, and we affirm.

No. 10-60957

I.

Kristi Fulgham shot her husband shortly before taking Edmonds and two of her children on a trip to the Gulf Coast. The next day, she told Edmonds that she had killed her husband and urged Edmonds to take the blame to protect her from the death penalty.  A day later, when county sheriff's deputies arrested Fulgham for the murder, she professed her innocence and fingered Edmonds, whereupon a deputy asked Clay to bring him in.

Accompanied at his interrogation by Clay, Edmonds first denied any knowledge until deputies removed her from the room and brought in Fulgham to urge Edmonds to "tell the truth."  Shortly thereafter, he confessed but retracted the confession a few days later.  The jury heard both the confession and the retraction.  Edmonds was convicted of murder and sentenced to life, but the judgment was overturned, *Edmonds v. State*, 955 So. 2d 787 (Miss. 2007), and he was acquitted on retrial.

At the interrogation, mother and son executed *Miranda* waivers.  Over the next two hours, deputies interrogated Edmonds in Clay's presence.  He insisted that he did not know anything about the killing and that he was the last one out of the house before the group left for the beach.  His interrogators said they did not believe him and continued to ask about the murder, assuring Edmonds that Fulgham had already accused him.

As long as Clay stayed in the room, Edmonds refused to admit any knowledge.  The sheriff eventually had the deputies escort Clay from the room against her will, based on his belief that Mississippi law did not forbid the separation. With Clay removed, the deputies reiterated to Edmonds his sister's accusation and showed him her written statement without letting him read it; Edmonds refused to believe the written statement, whereupon a deputy offered to have Fulgham repeat it in person.

Edmonds accepted and was allowed to visit with his mother while a deputy

2

went to get Fulgham. During the visit, he told his mother that he was at the station to "protect [his] sister." He was then taken to sit in a deputy's office, away from his mother, at which point Fulgham was brought in. She sat down next to him, had him hold her hand, and told him, "You need to tell them what happened. I've already told them and they know what happened and you need to tell them the truth," which Edmonds took as a cue to confess. Their visit lasted less than a minute, after which Edmonds was taken to another room, where he waited twenty to thirty minutes for deputies to set up video equipment. His *Miranda* rights were explained twice more, both before and after taping began, and he signed another waiver.

On video, Edmonds gave a detailed but false account of the fatal weekend, culminating in his statement that he and his sister together shot Fulgham's husband in his sleep, Fulgham standing behind Edmonds, with each having a hand on the trigger. After that admission, Edmonds continued through a detailed account of the weekend's travels until his mother entered the interrogation room, demanding to be present. She asked Edmonds whether he had a problem talking to the deputies without her, and he indicated no. She then learned what he had confessed. Mother and son both became distraught; the deputies stopped taping and let them speak in private. Edmonds, an honors student with no criminal record, was arrested and held in county jail.

Reflecting on the confession after his eventual acquittal, Edmonds summarized the interrogation process in an interview on the *Dr. Phil* show:

> Q.   Tyler, you went in with the idea of confessing when you went in there, right?
>
> A.   Um . . .
>
> Q.   You'd already made the deal with your sister?
>
> A.   Yes.

No. 10-60957

Q.    So, you just walked in and said you did it.

A.    No, at first I went in and . . . I denied having anything to do
      with it.  My mother was in the room with me, initially, and
      then they took her out of the room with me and wouldn't let
      her back into the room with me, and then, that's when I
      falsely confessed.

Q.    All right, but did you do it on purpose or were you coerced into
      it?

A.    Um, to confess?

Q.    Yes.

A.    I was coerced by my sister.

Q.    By your sister, but not by the police.

A.    Uh, no, not by the police.

*Dr. Phil: Headline Horror Stories* (CBS television broadcast Dec. 15, 2008).


II.

Edmonds and Clay alleged that deputies coerced Edmonds's confession in
violation of his Fifth Amendment self-incrimination right and his Fourteenth
Amendment due process rights; Clay's forced separation from her son violated
her Fourteenth Amendment parental rights; and the Mississippi youth court law
allowing the separation violates the Fourteenth Amendment's Equal Protection
Clause.  Both plaintiffs appeal on all issues save the equal protection challenge.


III.

Viewed under the totality of the circumstances, Edmonds's confession was
voluntarily given, meaning that its introduction at trial did not offend the Fifth
Amendment.  Although a thirteen-year-old's separation from his mother, his

4

No. 10-60957

desire to please adults, and his inexperience with the criminal justice system all weigh against voluntariness, his express desire to help his sister decides the issue. There is no evidence that, absent Edmonds's resolve to reduce Fulgham's punishment, the deputies' interrogation tactics would have produced a confession. Fulgham may have used her brother's love to make him lie on her behalf, but there is no evidence that the deputies knew of her plan.

Under the Fifth Amendment's privilege against self-incrimination, when a person confesses in custodial interrogation, courts "determine whether such a suspect's confession is coerced or involuntary by examining the totality of the circumstances surrounding the . . . interrogation." *Murray v. Earle*, 405 F.3d 278, 288 (5th Cir. 2005) (citing *Fare v. Michael C.*, 442 U.S. 707 (1979); *Gachot v. Stadler*, 298 F.3d 414, 418 (5th Cir. 2002)). When the suspect is a child, the evaluation must consider his "age, experience, education, background, and intelligence, and [inquire] into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Michael C.*, 442 U.S. at 725. Police must take special care to ensure the voluntariness of a minor suspect's confession:

> If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

*In re Gault*, 387 U.S. 1, 55 (1967).

Although some circumstances in this case may indicate susceptibility to police coercion, their relevance pales beside Edmonds's stated desire to help his sister. Improper police tactics did not implant that desire: In all likelihood, Fulgham's manipulation did. Edmonds revealed that motive not only after the fact, in his videotaped retraction (and also later on national television), but also

5

before the fact, to his mother in advance of his brief meeting with Fulgham and the subsequent false confession. The deputies likely presumed that Edmonds loved his sister, but he and his mother do not argue that the deputies knew that bringing Fulgham to meet with him would further her exploitative scheme.[1]

Despite that separation from a parent weighs heavily in a voluntariness analysis,[2] Edmonds appears to have desired the separation so that he could falsely confess without triggering the eventual emotional downpour. In a moment alone with his mother before meeting with Fulgham at the station, he told Clay he was trying to protect his sister, and he apparently carried out that plan by confessing shortly thereafter. When Clay pushed into the interrogation room later, she asked him, "Do you have a problem talking to them without me?" and he indicated no. Though it is possible that Edmonds might never have confessed if not separated from his mother, the separation did not give him a new motive to confess but only removed an emotional obstacle in the way of his pre-existing intention.

The other factors commonly considered in a voluntariness analysis do not decisively point in one direction. Edmonds was young (thirteen)[3] and had no prior contact with the criminal justice system. At the same time, he and his mother came to the station voluntarily; his mother was in the room with him for much of the evening; he was intelligent; and he had his *Miranda* rights explained three times and signed two waivers, the first with his mother. The interrogation totaled three hours, but with multiple breaks, including a twenty-

---

[1] *See generally Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986) (reviewing Supreme Court cases finding coercion where police knowingly exploited a suspect's vulnerability).

[2] *See, e.g.*, *Murray*, 405 F.3d at 289.

[3] The Supreme Court has cited the age of a fourteen-year-old in one case, *Gallegos v. Colorado*, 370 U.S. 49, 53-55 (1962), and of a fifteen-year-old in another, *Haley v. Ohio*, 332 U.S. 596, 599-600 (1948) (plurality opinion), as factors supporting an involuntariness finding.

No. 10-60957

to thirty-minute wait caused not by pressure tactics but by the need to set up video equipment.

The totality of the circumstances indicates that Edmonds's confession was voluntary.[4] The deputies' bringing Fulgham in seems at most to have strengthened his previously formed intent. The separation from Clay seems only to have given Edmonds the emotional opportunity to act on that intent; nothing the deputies did after their separation (which was punctuated by at least one brief reunion, at which Edmonds expressed his intent to protect his sister) seems to have given him a motive to act. Looking back on his interrogation after he was released from prison, Edmonds told a national television audience that the deputies did not coerce him into confessing. We agree.

IV.

Under *Chavez v. Martinez*, 538 U.S. 760 (2003), "coercive questioning by a law enforcement officer may support a § 1983 substantive due process 'shocks the conscience' claim even when the suspect's statements are not used at trial."[5] Unlike the self-incrimination trial right, this freestanding substantive due process right is available outside of trial as well, but it is not available here. The same circumstances indicating that Edmonds's confession was voluntary also indicate that his interrogation does not shock the conscience.[6]

---

[4] Because the confession was voluntary, we do not consider whether admitting it into evidence was a superseding cause of Edmonds's incarceration.

[5] 1 MARTIN A. SCHWARTZ, SECTION 1983 LITIGATION § 3.22[A], at 3-680 (4th ed. 2011) (restating portions of *Chavez*).

[6] We need not decide here whether a confession held voluntary under the Fifth Amendment could ever violate the Fourteenth Amendment.

No. 10-60957

V.

Independently of Edmonds's coercion claim, Clay argues that the deputies violated her parental rights under the Fourteenth Amendment when they inter-rogated Edmonds outside her presence, over her objection. Clay's due-process claim is time-barred, however, because any cause of action accrued on May 12, 2003, when Edmonds was separated from her; it thus lapsed three years later, well before Clay sued.

Under federal law, the statute of limitations under § 1983 begins to run "the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Helton v. Clements*, 832 F.2d 332, 335 (5th Cir. 1987). Because no specified federal statute of limi-tations exists for § 1983 suits, federal courts borrow the forum state's general or residual personal-injury limitations period, *see Owens v. Okure*, 488 U.S. 235, 249-50 (1989), which in Mississippi is three years, MISS. CODE ANN. § 15-1-49 (2011).

Although a § 1983 action arising from Edmonds's conviction could not be sought until that conviction was overturned, *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), that accrual pertains to his action, not Clay's. Assuming that the Fourteenth Amendment countenances her injury, her cause of action accrued on May 12, 2003, because she was immediately aware of her separation from Edmonds at a point at which she, a fit parent, believed it in his best interest not to answer questions without her being present. Her claim was thus long time-barred when she and Edmonds sued on March 20, 2009.

AFFIRMED.