[991 NYS2d 260]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v KYSHEEN OLIVER, Defendant.

Supreme Court, Kings County, July 9, 2014

## APPEARANCES OF COUNSEL

*Law Office of David T. Roche*, New York City (*David T. Roche* of counsel), for defendant.

*Kenneth P. Thompson, District Attorney*, Brooklyn (*Elizabeth Doerfler* of counsel), for plaintiff.

## OPINION OF THE COURT

ANN DONNELLY, J.

The defendant is charged with murder in the second degree

and related crimes. It is alleged that on March 17, 2011, the defendant beat 17-month-old Kymel Orem to death. The defendant moves to permit two witnesses to testify at trial—Dr. Alexander Sasha Bardey, a psychiatrist who proposes to testify that the defendant has personality traits that make him susceptible to confessing falsely, and Dr. Alison Redlich, an assistant professor who did not examine the defendant, but who proffers herself as an expert in police tactics and false confessions in general. The People oppose. For the reasons that follow, the motion is denied in its entirety.

On May 11, 2011, the defendant was arraigned on the indictment and pleaded not guilty. The ensuing two years included extensive motion practice and protracted delays for DNA testing and results. In May 2013, two years after his arraignment, defense counsel stated that he intended to introduce psychiatric testimony and that he wanted to call an expert on the phenomenon of false confessions; he did not serve written notice as required by Criminal Procedure Law § 250.10 (2). The People objected to the lateness, form, and content of the notice. The court did not rule on the propriety of the notice, but granted the defendant's request for an adjournment to conduct the psychiatric examination. The defendant retained Dr. Alexander Sasha Bardey, who examined the defendant on June 26, 2013, but did not prepare a report.

## The *Huntley/Dunaway* Hearing

*Huntley* and *Dunaway* hearings were held on July 15, 2013. The evidence at that hearing established that on March 17, 2011, detectives were investigating the beating of Kymel Orem, a toddler who lived with his foster mother Teyuanna Cummings, two older children and the defendant. Kymel had multiple injuries to his internal organs and was bleeding internally; he was not expected to survive.[1] As part of the investigation, detectives interviewed Ms. Cummings; she told them, among other things, that she left Kymel alone with the defendant while she took the older children to school, that when she came home Kymel had vomited and was wearing different clothes, that she called 911, and that the defendant left the apartment at some point. Detectives administered a polygraph examination, which Ms. Cummings failed. They also interviewed Ms. Cummings' older child. Because the defendant was home alone with Kymel detectives issued an "I" card indicating that he was a suspect.

---

1. Kymel died on March 28, 2011.

They also called his family and said that they would like to speak with him.[2]

Two days later, on March 19, 2011, Detective Patrick Angst, the assigned detective, was preparing to go home because he had been working on the case for two straight days, and had not slept. At about 1 o'clock that afternoon, the defendant and a female relative arrived unexpectedly at the precinct; the defendant said that he knew the police were looking for him, and that he wanted to talk to them. Detective Angst was not ready at that point to speak to the defendant. There were no other available detectives to do the interview with him, and he wanted to review the case file before talking to the defendant. In addition, he wanted to shower and to put on a suit. Accordingly, he escorted the defendant and his relative to a room, explained that he was not prepared to speak with the defendant, and told the woman that she was "more than free" to stay until he was ready to interview the defendant. The detective then left, leaving the door to the interview room open. The defendant was not in custody, and was free to leave.

By around 5 o'clock that afternoon, Detective Mark Brooks arrived at the precinct, and he and Detective Angst went to interview the defendant. Detective Angst explained to the defendant and his relative that he would like to speak with the defendant alone; he asked the relative to leave the room, and told her she could wait in the waiting area, or do "whatever she wanted." The woman said she was leaving, and that the defendant could call her if he needed her. She left the precinct.

Detective Angst advised the defendant of his rights from a form. The defendant, who was calm and cooperative, said that he understood each right, and agreed to speak with the detectives. Detective Angst wrote down the defendant's response to each question. He also asked the defendant to initial each right, and to sign the form, but the defendant said that he did not want to sign anything because he "didn't like signing [his] name to things."

After the defendant waived his rights, Detective Angst told him that Kymel appeared to have been beaten, and asked "what his story was," and where he was at the time Kymel was injured. The defendant said that he was alone with the baby, that the

2. At some point on March 18, 2011, a lawyer called the precinct and said that the defendant's family had contacted him. He had not been retained to represent the defendant, and did not know where the defendant was. The defense did not raise any right to counsel issue at the hearing.

baby had a dirty diaper, and that there was "doo doo" all over the bed and the floor. The defendant then walked the child to the bathroom, bathed and dressed him, and put him back in his room. When the defendant checked on him later, the child was lying in vomit. The defendant called Ms. Cummings, and they called 911. The defendant left the apartment when the police came, and stayed in front of the building for the rest of the day. He did not know how Kymel had sustained his injuries; he said that he had never seen Ms. Cummings hit the baby, and did not think that she caused his injuries.

At about 7 o'clock that night, Detective Angst gave the defendant a legal pad, and asked if he would write out his statement. The defendant said that he would, and both detectives left the defendant in the room by himself, periodically checking through the two way mirror to see if he was finished. The defendant finished writing after about 45 minutes, and Detective Angst returned to the room.[3] He asked if the defendant had "said everything that he wanted to say," and the defendant said yes. Detective Angst read the statement aloud, signed and dated it, and put the time at the bottom.

The defendant began the statement by saying, "Hey, my name is Kysheen Oliver and I am here to explain what happened on Thursday when Kymel was hit by accident." The defendant wrote that "it was a big mistake," that he "snapped" and did not know how much force he had used. He explained that he was "trying to calm him down from all the whining and crying" and that he hit the child twice. The defendant "did not know how much force came out of" him. He also said that he did not mean to hurt the child, that he loved him, that he was sorry, that he "came down here as a man to handle what I gotta handle" and that he knew that he had an "anger problem." The defendant refused to sign the statement, stating again that he did not like "signing [his] name to things." The defendant asked about "anger management." Detective Angst answered that "wherever you go from here today, if you ask for help, they'll give it to you." Detective Angst placed the defendant under arrest.

The defense did not present any evidence.

Following oral argument by both parties, the court made findings of fact and conclusions of law. The court credited the detective's testimony, and concluded that the defendant was not

---

**3.** Detective Brooks did not come back into the room.

in custody at the time he made his statements, but that the detective had nonetheless advised him of his constitutional rights. The court also concluded that the statements were voluntary, and that the defendant's statement provided probable cause to arrest him. Accordingly, the court denied the motion to suppress the statements.

### The Defense Withdraws the Prior Oral Notice of Intent to Offer Psychiatric Testimony

Because the defense had not yet submitted the motion to permit expert testimony, the court set a motion schedule, and adjourned the case to September 30, 2013 for decision. On that date, however, the defendant withdrew his section 250.10 notice and informed the People and the court that he no longer intended to introduce psychiatric or expert testimony at trial. The case was adjourned to January 21, 2014 for trial.

### The People's Application to Introduce the Defendant's Adoptive Admissions

On the date set for trial, the court heard pretrial motions before sending for a jury panel. The People made an in limine application to permit the introduction of a taped telephone conversation initiated by the defendant while he was incarcerated at Rikers Island, with a female relative.[4] In that conversation, which was about six minutes long, the defendant and the woman discussed the fact that the case had been reported in the newspapers. The defendant asked what had been reported, and the woman replied that the story said that "she went to the store . . . and left you babysitting and when she came back, the baby was having problems breathing." Next, the woman said, "You know you're going to have to do some time," and mentioned possible sentences; the defendant replied, "Yeah." With respect to the crime itself, the woman said, "It was an accident," to which the defendant replied, "Yeah." She then said, "You didn't know the extent that you hit the baby. You didn't mean to do it. You need to let them know that you did not mean to do it and that you're sorry." The defendant again replied, "Yeah." The woman repeated that the defendant "did not mean for it to happen" and that he "didn't know." The defendant replied, "Yeah." After commenting that the case was "bad" but that the papers would try to make it appear worse, the woman

---

4. The People had previously provided defense counsel with copies of the tape recorded conversation.

assured the defendant that "everything is going to be all right." The defendant answered, "Hopefully." The defendant asked about getting into protective custody because of the publicity surrounding the case, and the woman recommended that the defendant "be cool."

The defense opposed the People's application, claiming that there was insufficient evidence that the defendant heard the statements or that he understood them. He also argued that the defendant was not at liberty to respond to his relative because his attorney had advised him not to speak on the telephone. He asked permission to brief the issue, which the court granted. The case was adjourned to February 10, 2014 for decision.

On that date, the court issued an oral decision, ruling that the relative's statements and the defendant's responses were adoptive admissions. (*People v Campney*, 94 NY2d 307 [1999].) The substance of the ruling is as follows:

The evidence is that defendant initiated the conversation by calling his relative, that he understood and responded to her statements regarding the child's death, and that he understood the implication of what she said. He expressed neither surprise nor disagreement with anything that she said; rather, he responded affirmatively. Under these circumstances, the fact that the defendant did not contradict the statements, but in fact affirmed them "justifie[s] an inference of assent by acquiescence as to the truth thereof." (*People v Williams*, 251 AD2d 266, 267 [1st Dept 1998]; *People v Egan*, 78 AD2d 34, 36 [4th Dept 1980].)

The conversation is particularly relevant in the context of the defense, which is that the defendant's girlfriend killed the baby, that he had nothing to do with it, and that his statements to detectives admitting the beating were coerced. It is surely relevant that at an earlier time, in a conversation with a trusted relative whom he called, the defendant assented to the statement that he committed the act, but that it was accidental, and agreed that he would have to serve a prison term because of his actions. The nature of his relative's statements—that the defendant did in fact kill the child, but did not do it intentionally—demanded a different response if the defendant had been "surprised or appalled" by it. (*People v Benanti*, 158 AD2d 698, 699 [2d Dept 1990]; *see also People v Hoover*, 162 AD2d 710, 712 [2d Dept 1990].)

The defendant's claim that he was not at liberty to discuss the case with his relative because his lawyer told him not to

speak on the phone is not persuasive. The defendant ignored whatever advice his lawyer gave him, placed the call and spoke about the case. The defendant's further objection that the court's ruling requires his lawyer's testimony is similarly meritless, particularly in view of the People's willingness to stipulate that counsel advised the defendant not to speak about the case. (*See People v Ortiz*, 114 AD3d 430 [1st Dept 2014]; *People v Castillo*, 94 AD3d 678 [1st Dept 2012].)

Following the decision, the court adjourned the case to February 13, 2014 for jury selection.

### The Defense Resurrects the Application to Present Expert Testimony

On February 13th, although the case was set for trial, the defendant claimed that the court's ruling on the motion in limine necessitated a renewal of his motion pursuant to section 250.10 to introduce psychiatric and expert testimony regarding false confessions. The People opposed, pointing out that the evidence that the defendant's telephone admission to beating the victim made so-called false confession evidence even less relevant, since the defendant's statements to his relative buttressed his written confession. In an excess of caution, the court permitted counsel to have the defendant reexamined, and to submit a written motion in support of his application.

On February 28, 2014, Dr. Bardey performed a second examination, and this time submitted a report dated March 14, 2014. The defendant also hired Dr. Allison Redlich, a research psychologist and an associate professor of criminal justice at the University of Albany, State University of New York, as a proposed expert in the phenomenon of false confessions. She did not examine the defendant, but submitted an affirmation outlining her opinions and conclusions about false confessions in general.

### Analysis

### Timeliness of the Motion

A defendant may not introduce psychiatric evidence at a trial unless he "serves upon the People and files with the court a written notice of his intention to present psychiatric evidence. Such notice must be served and filed before trial and not more than thirty days after entry of the plea of not guilty to the indictment." (CPL 250.10 [2].) The court may permit late filing

of the notice in the interests of justice, and if the defense demonstrates good cause for failing to comply with the statute. The rule is designed to promote the efficient preparation of time-consuming psychiatric evaluation and preparation of evidence, thereby eliminating the element of surprise. (*People v Almonor*, 93 NY2d 571, 578-79 [1999]; *People v Berk*, 88 NY2d 257, 264 [1996].) Late notice "may place the People at an unfair disadvantage in that, surprised by the sudden interposition of [a] collateral defense, they may have insufficient opportunity to obtain the psychiatric and other evidence necessary to refute it." (*People v Berk* at 265.)

The defense did not raise the possibility of a psychiatric claim until May 2013, a full two years after the defendant's arraignment. Even then, the notice was oral, and the defense provided no justification for the form or the tardiness of the application. The issue became academic when defense counsel withdrew the application in September 2013. On the eve of trial, in February 2014, the defense reversed course yet again, and asked permission to introduce a form of psychiatric testimony. Given this sequence of events, the court would have been justified in simply denying the application. Nevertheless, the court authorized the defense to retain experts to examine the defendant, and agreed to consider the defendant's motion.

The defendant has never attempted to justify the lateness or the form of his notice, nor does he claim good cause for his failure to comply with the statute. Instead, he simply argues information that has been available to him since the inception of this case—the circumstances of his statements to detectives on March 19, 2011. Of course, even if the defense had established good cause, the court would still have to weigh the defendant's right to present his defense against the prejudice to the People by the late notice. (*People v Berk* at 266.) Like most evidence, psychiatric evidence does not improve with age. That is particularly true in the context of the evidence the defense proposes to present here: that the defendant's supposedly compliant personality made him susceptible to confessing falsely. Under these circumstances, the evaluation of the defendant should have taken place as close to the time of the contested event—the defendant's confession—as practicable. Here, however, the defendant's own expert did not examine the defendant until 2013, and prepared no report until after a second examination in early 2014, almost three years after the defendant's arrest and confession.

If the court were to permit the defense to introduce psychiatric testimony, the People would have to have the opportunity to hire their own psychiatrist to examine the defendant. At this late stage, however, the People's ability to do an accurate assessment of the defendant is seriously compromised. The defendant has been incarcerated since his arrest, and subject to the rigors of prison life, which might very well make him "a passive and compliant young man," as Dr. Bardey concluded during an interview that took place years after the event in question. The defendant's unjustifiable delay obviously undermines the People's ability to prepare their response to the defense, as well as the relevance of the evidence itself.

Given that the defendant has failed to comply with every requirement of the statute—timeliness, form, and a showing of "good cause" for failure to comply—the court would be justified in precluding admission of this evidence on this ground alone. (*People v Almonor* at 581; *see also People v Di Donato*, 87 NY2d 992 [1996].) However, even had the defendant's application conformed to the statute, the testimony would not be admissible.

### The Proposed Testimony

The phenomenon of false confessions is hardly new. On the contrary, the law has long recognized the possibility that a person might confess falsely, perhaps because of coercion by law enforcement, because of some mental or psychological deficiency, or in order to shield another person from prosecution. Our courts are appropriately concerned that the admission of false or coerced confessions will lead to unjust convictions, which harm not only the particular criminal defendants, but victims of crime and our system of justice. For that reason, New York takes special steps to ensure the reliability of a criminal defendant's statements, requiring that confessions be corroborated (CPL 60.50), and mandating specific and detailed instructions to jurors about how they should evaluate evidence of a defendant's statements.

However, New York courts considering the admissibility of so-called "expert" testimony in the area of false confessions have almost unanimously rejected it. (*See People v Rosario*, 100 AD3d 660 [2d Dept 2012]; *People v Mutterperl*, 97 AD3d 699 [2d Dept 2012]; *People v Walker*, 87 AD3d 1352 [4th Dept 2011]; *People v Crews*, 74 AD3d 983 [2d Dept 2010]; *People v Ragsdale*, 68 AD3d 897 [2d Dept 2009]; *People v Bean*, 66 AD3d 1386 [4th Dept

2009]; *People v Herrnkind*, 49 AD3d 555 [2d Dept 2008]; *People v Days*, 31 AD3d 574 [2d Dept 2006]; *People v Shepard*, 259 AD2d 775 [3d Dept 1999]; *People v Green*, 250 AD2d 143 [3d Dept 1998]; *People v Lea*, 144 AD2d 863 [3d Dept 1988]; *People v Kaye*, Sup Ct, Kings County, Dec. 19, 2012, Gary, J., index No. 3421/11; *People v Jeremiah*, Sup Ct, Broome County, Feb. 29, 2012, Cawley, J., index No. 574/10; *People v Lowery*, Sup Ct, NY County, Jan. 11, 2010, Carruthers, J., index Nos. 5850/07, 4346/08; *People v Williams*, Sup Ct, Kings County, May 15, 2008, Hall, J., index No. 4840/05; *People v Wiggins*, 16 Misc 3d 1136[A], 2007 NY Slip Op 51715[U] [Sup Ct, Bronx County 2007] [Greenberg, J.].)[5]

■ The Court of Appeals addressed the issue for the first time in *People v Bedessie* (19 NY3d 147 [2012]), ruling that "[i]n a proper case expert testimony on the phenomenon of false confessions should be admitted" (*id.* at 149) and that experts "may offer valuable testimony to educate a jury about those factors of personality and situation that the relevant scientific community considers to be associated with false confessions" (*id.* at 161). Nevertheless, the Court upheld the trial court's decision to preclude the testimony of the proposed expert, Dr. Richard Olfshe, ruling that he had "nothing to say that was relevant to the circumstances of this case" and that his proffered report was "filled with discussion of extraneous matters, speculation and conclusions based on facts unsupported even by [the] defendant's version of her interrogation." (*Id.* at 157-158.) In order to be admissible, the Court held, the proposed testimony must be "relevant to the defendant and interrogation before the court." (*Id.* at 161.)

The testimony proposed by the defense does not meet the *Bedessie* standard. As an initial matter, none of the evidence the defendant seeks to admit at trial was introduced at the *Huntley/Dunaway* hearing. Since one of the purposes of that hearing was to determine whether the defendant's statements were voluntary, the hearing would have been the appropriate place to present evidence that it was not, including any psychological evaluation of the defendant, the defendant's own testimony about the police interrogation, and the testimony about false confessions. (*See Bell v Ercole*, 2011 WL 5040436, 2011 US Dist LEXIS 122314 [ED NY, Oct. 21, 2011, No. 05-CV-4532(ERK)].)

---

5. This court is aware of only one case in which false confession testimony was admitted. (*People v Kogut*, 10 Misc 3d 305 [Sup Ct, Nassau County 2005].)

At a suppression hearing, there would be no risk that a jury would be misled or confused, or that an expert would invade the jury's fact-finding function. In any event, had Dr. Bardey and Dr. Redlich testified consistently with their submissions to this court, their testimony would not have changed the court's conclusion about the voluntariness of the defendant's statements to the police, because the testimony of both witnesses is unreliable and irrelevant.

Dr. Alison Redlich, one of a small group of social scientists who have repeatedly proffered themselves as experts on the subject of false confessions, describes herself as an expert in "the areas of social influence, decision making, scientific methods, and specifically interrogation techniques and confession." She asserts that her testimony "will give jurors a more accurate understanding how to weight [sic] the confession itself and how to avoid using inaccurate cues and assumptions to judge the truthfulness of the confession and/or the defendant's testimony about his confession," yet her proffer makes no reference to the defendant at all, nor to the particular circumstances of this case. Instead, she has provided what appears to be a general treatise on the subject of false confessions. For that reason alone, her proposed testimony does not meet the threshold standard required by the Court of Appeals—that the proposed testimony be relevant to the particular facts of the case before the court.

Moreover, while Dr. Redlich has impressive academic credentials, there are serious reasons to question the extent of her expertise, the legitimacy of the theories she propounds, and her objectivity. The *Bedessie* Court's recognition that a qualified professional may, in the appropriate case, provide testimony about the factors that could induce a person to testify falsely does not mean that every researcher who claims an expertise in this area should be permitted to testify. The admissibility and limits of expert testimony are primarily matters for the sound discretion of the trial court. (*People v Lee*, 96 NY2d 157, 162 [2001]; *People v Cronin*, 60 NY2d 430, 433 [1983].) In exercising that discretion, the court must carefully consider whether the testimony is relevant and whether it will aid the jury, and also whether the proposed witness is in fact an expert in the area the defense seeks to explore. A trial court always has the obligation to ensure that any expert testimony be premised on careful and impartial scientific analysis (*see People v Wernick*, 89 NY2d

111 [1996]), and is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (*General Electric Co. v Joiner*, 522 US 136, 146 [1997]; *see also Kumho Tire Co. v Carmichael*, 526 US 137, 157 [1999].) In other words, the mere assertion by the proposed expert that she is in fact an expert is not a basis to admit her testimony.

Similarly, the court is not required to accept Dr. Redlich's assertion that her theories are "generally accepted among scientists," especially since many of the researchers she includes in that group are the very researchers whose testimony has been consistently rejected by New York courts. (See cases cited supra.) As some of those cases make plain, the "relevant scientific community" is not at all unanimous about false confession research, the methods employed by Dr. Redlich and her colleagues, and the conclusions they reach. Dr. Michael Welner, a board certified psychiatrist, is of the opinion that false confessions are "rare events," and that the only way to determine whether a confession is actually false is through DNA testing that disproves the guilt of the confessing defendant. (*People v Williams*, Sup Ct, Kings County, May 15, 2008, Hall, J., index No. 4840/05.) According to Dr. Welner, it is only through "rigorous psychological and psychiatric examinations" that a professional can determine whether a person is susceptible to confessing to a crime he did not commit. He dismisses the theories Dr. Redlich and her colleagues advocate as "soft science," pointing out that some of the research actually relied on newspaper reports of cases as sources of allegedly false confessions. (*People v Lowery*; *see also United States v Wilson*, 2007 WL 1701866, *4, 2007 CCA LEXIS 70, *11, NMCCA 200300734 [N-M Ct Crim App 2007] [expert opined that Dr. Olfshe's theories were "not . . . sufficiently tested," have an "unacceptably high rate of error," "depart from accepted standards," and are not "accepted in the relevant scientific community"].)

There is even dissension among the researchers that Dr. Redlich cites. One of them, Dr. Saul Kassin, has conceded that there is no "scientific basis for distinguishing true from false confessions," that "[f]urther research in the field is sorely needed," and that lay people may be able to assess whether confessions are in fact false. (*Commonwealth v Robinson*, 449 Mass 1, 6, 864 NE2d 1186, 1190 [2007].) Dr. Olfshe, the proposed expert in *Bedessie*, has apparently described an experiment of Dr. Kassin's that purports to quantify the frequency of false confessions as "laughable," "incompetent," "so stupid,"

and "terribly naive." (*See People v Lowery.*)[6] Dr. Redlich herself has admitted that her theories cannot be tested empirically. (*Edmonds v Mississippi*, 955 So 2d 787 [Miss Sup Ct 2007].)

An examination of Dr. Redlich's submission in this case underscores the wisdom of the decisions rejecting this particular brand of false confession testimony. Like the testimony proffered in *Bedessie*, Dr. Redlich's report is filled with speculation, unsupported theories, and advocacy rather than expertise. There is no empirical support for many of her assertions. For example, she maintains that there is "an alarmingly high incidence of wrongful convictions," and that "[a]pproximately 25%" of this unidentified number "involve false admissions." But her premise is itself unscientific. She does not quantify the supposedly "alarmingly high incidence" of wrongful convictions, does not detail how a conviction is determined to be "wrongful," and does not explain the method or formula by which a confession is determined to be false.

There is similarly no support for Dr. Redlich's hypothesis that jurors are incapable of entertaining the possibility that a confession could be false. The jury system is premised on the ability of citizens to determine whether particular evidence is true or false. Perhaps the best refutation of Dr. Redlich's mistrust of a jury's competence in this regard is a case in which she had firsthand involvement, *Edmonds v Mississippi*. The defendant in that case, a juvenile, confessed to helping his stepsister kill her husband. The trial court precluded Dr. Redlich's testimony as insufficiently reliable, a decision that the appellate court upheld, while reversing Edmonds' conviction on other grounds and remanding for a new trial. The jury at the second trial heard the evidence of the defendant's confession and acquitted him, obviously fully capable of weighing the evidence without any assistance from Dr. Redlich. (*See Edmonds v Oktibbeha County*, 2010 WL 4942273, 2010 US Dist LEXIS 126800 [ND Miss 2010, Civil Action No. 1:09CV00070-B-D], *affd* 675 F3d

---

**6.** In this experiment—the so-called "alt key" experiment—college students were given a typing assignment, and warned that pressing the "alt" key would cause their computers to crash and destroy important information. The administrator of the test caused all of the computers to crash, and then accused each student of pressing the "alt" key. A significant percentage of the students admitted, apparently falsely, that they pressed the "alt" key. The study bears little if any similarity to an actual arrest situation; the rather trivial act of pressing a computer key is a far cry from killing someone, the students had not been advised of their constitutional rights before questioning, and they faced no consequences as a result of their admissions.

911 [5th Cir 2012].) The court has every confidence that jurors in this case will be fully capable of sorting out the issues, evaluating the evidence, and deciding what they believe and what they do not believe.

Another pillar of Dr. Redlich's thesis is the role that police interrogation methods play in false confessions. This part of her theory also suffers from multiple flaws. A review of her curriculum vitae reveals that Dr. Redlich has never worked in any law enforcement capacity, nor does she articulate the basis of her theoretical expertise. She is nonetheless critical of law enforcement in general, and police interrogations in particular, which she describes as "confidence games" with "strategies based on the manipulation and betrayal of trust." Given these views, it is difficult to envision an interrogation of which she would approve. In any case, while she is a critic of the police, the court does not accept her statement that she is an expert in police methods, at least insofar as this case is concerned.

Dr. Redlich does not appear to know anything about police practices in New York City, as demonstrated by her descriptions of particular interrogation methods. She assumes that all police departments use the same interrogation methods, including the "Reid Technique," which Dr. Redlich labels the "bible of police interrogation," as well as a behavioral analysis interview, the importance of which, Dr. Redlich opines, "cannot be understated [sic]." Dr. Redlich also maintains, again without explanation, that "police have developed methods to get suspects to talk 'outside of Miranda.' " Another hallmark of all police questioning, according to the doctor, is a three phase process: (1) "custody and isolation" in which the suspect is "detained in a small room" to "experience the anxiety, insecurity, and uncertainty" of police questioning; (2) "confrontation," in which the suspect is "presumed guilty," "told (sometimes falsely) about the evidence" against him, and is "prevented from denying his/her involvement in the crime," and; (3) "minimization," where a "now sympathetic interrogator attempts to gain the suspect's trust," offers "face-saving excuses," and "implies" that the suspect will get a shorter sentence if he confesses, and a longer one if he does not.

Conspicuously absent from Dr. Redlich's submission is any scientific connection between these techniques and false confessions; there are no statistics about the number of false confessions caused by the utilization of these techniques. (*See People v Lowery*.) More important, there is simply no evidence that the

New York City Police Department uses the "Reid technique," let alone any evidence that the investigating detective in this case did. In fact, Detective Angst's testimony on cross-examination demonstrates exactly the opposite:

> "Q: And when you first became a detective you went through extensive training in interrogation techniques and other aspects of detective work, right?
>
> "A: No.
>
> "Q: When did you first undergo interrogation training?
>
> "A: When I got to the detective squad.
>
> "Q. What did that training consist of?
>
> "A: Just mostly paperwork and interviews.
>
> "Q: Were you trained in methods of trying to get suspects to make admissions and confessions?
>
> "A: No
>
> "Q: You never got training in that?
>
> "A: In a method, no.
>
> "Q: Now, detective, have you ever been trained in isolation techniques for a suspect?
>
> "A: No."

The detective also denied that he said anything to the defendant about the consequences of a conviction for killing or injuring the child, or anything about a possible sentence. The fact that the detective did not employ the techniques that are central to Dr. Redlich's theories is yet another reason to preclude her testimony.

Nor does this case have any of the "commonalities" that Dr. Redlich says exist in so-called "proven" false confession cases. According to her, false confession cases typically involve juveniles or people with mental impairments, and are characterized by very long interrogations where the suspect is isolated and deprived of sleep. The police employ deceit and trickery, and there is often little or no corroborating evidence. Even accepting all of Dr. Redlich's analysis at face value—a dubious proposition, since this section is also long on anecdotes and generalizations and short on science—none of her theories has anything to do with the facts of this case. (*See Rathbun v Scribner*, 2010 WL 1266666, 2010 US Dist LEXIS 31502 [CD Cal 2010, Case No. CV-08-3339-AG (PJW)].)

The defendant is not a juvenile, and has no mental or intellectual deficits. He was never isolated or in police custody; on

the contrary, he appeared at the precinct of his own accord, with his family, in the middle of the day. The only person who was deprived of sleep appears to be the investigating detective, who did not know the defendant was coming in, and was just leaving the precinct after having worked for two straight days. The interrogation itself was slightly less than three hours, well below what Dr. Redlich deems excessive. Moreover, there is evidence that corroborates the details of the defendant's confession. Other witnesses are apparently prepared to say that the defendant was alone with the baby at the time the fatal injuries were inflicted. Most significant, the defendant's recorded telephone conversation with his relative confirms what he said to the police.

Thus, even assuming for argument's sake that Dr. Redlich's proposed testimony had the requisite acceptance in the relevant scientific community, it has no relevance at all to this case. It would not aid the jury, and meets none of the criteria outlined in *Bedessie*. The court therefore denies the defense application to introduce her testimony.

█ Likewise, the court denies the defense application to call Dr. Alexander Bardey. Dr. Bardey is an expert in forensic psychiatry, and is capable of performing a thorough evaluation of a defendant to determine his mental and intellectual capacity. In this case, however, nothing about Dr. Bardey's proposed testimony is relevant to the facts of this case or admissible at a trial.

First, Dr. Bardey concedes that the defendant does not suffer from any mental illness or intellectual deficit. On the contrary, Dr. Bardey concluded that the defendant is of average intelligence, with no mental abnormalities. In other words, there is no psychiatric condition or mental disability about which the doctor could testify. What Dr. Bardey is prepared to discuss are the defendant's personality traits, as opposed to some mental abnormality. Courts have excluded expert testimony offered to demonstrate that a defendant's personality traits make him susceptible to confessing falsely, because the testimony is irrelevant, potentially confusing, and "lacking in the degree of certainty which would give it probative force." (*People v Lea*, 144 AD2d 863, 865 [3d Dept 1988]; *see also People v Days*, 31 AD3d 574 [2d Dept 2006]; *People v Koury*, 268 AD2d 896 [3d Dept 2000]; *People v Green*, 250 AD2d 143 [3d Dept 1998].)[7]

---

7. Dr. Bardey is apparently prepared to go beyond testifying that the defendant's personality traits make him susceptible to confessing falsely, and to

Even assuming that personality trait testimony is admissible, however, it would only be admissible if it reflected the defendant's personality traits at the time he made statements. Dr. Bardey's examination of the defendant, such as it was, took place a full two years after the defendant's statement to the police, and sheds no light on the defendant's state of mind at the time he spoke to the police.

Second, while Dr. Bardey's report has some of the trappings of a forensic interview, it is in reality merely a conduit for inadmissible hearsay and the irrelevant opinions of the defendant and his family and friends. (*See People v Ciaccio*, 47 NY2d 431 [1979] [proposed expert testimony that had as its sole purpose affirming the testimony of other witnesses usurps the jury's function].)

Dr. Bardey consulted almost no neutral sources in preparing his report. It does not appear that he reviewed any of the defendant's school records or his arrest record. Moreover, according to his report, Dr. Bardey administered a single diagnostic test, a "mental status examination," but the results of that test have not been provided to the court except in a brief narrative summary. Instead, he relied on the defendant's report about himself and his background, his opinions about the police in general, and his account of his interview by the police.

Perhaps most incomprehensible is Dr. Bardey's failure to listen to the actual recording of the defendant's telephone conversation with the defendant's relative, Ms. Pinckney, and his decision instead to rely on Ms. Pinckney's truncated and inaccurate description of that conversation, her statement that the defendant "doesn't hold full conversations over the phone," and her opinion that the conversation was "taken out of context." The recording itself demonstrates that the defendant initiated the call, that he was a willing participant in the conversation, and that he affirmed her statements that he killed the child accidentally, evidence that buttresses the reliability of his statements to the police, and undermines Dr. Bardey's conclusion that the police used "guilt and fear tactics" to get the defendant to confess.

---

opine that the defendant does not have the personality of a killer. Thus, the doctor observes that the defendant showed "no evidence of depravity or lack of empathy for the others or the laws of society," and even surmises that Teyuanna Cummings may be the "real culprit." This opinion testimony is so obviously inadmissible that the court will not address it, other than to note that it casts some doubt on Dr. Bardey's objectivity in this case.

That conclusion was undermined by the hearing evidence as well, which revealed that the defendant came of his own accord to the precinct, that he was not even in custody at the time he was questioned, and that the questioning itself was not coercive. The additional evidence that the defendant refused to sign either the *Miranda* form or the statement he wrote conflicts with the doctor's description of the defendant as a "non-confrontational, passive and compliant young man."[8]

Dr. Bardey's report also cites the defendant's family members, who provided opinions and speculations about a wide range of subjects: the defendant's good reputation—"a really good kid" who loves children, and "never got into trouble;" the actions of the police—that they "picked on someone really weak" and "coerced" the defendant into writing a statement; the defendant's susceptibility to pressure—he was "scared," "pressured," "distraught," "vulnerable," and "didn't understand what the cops were saying to him;" that the defendant could not have killed the child—"no one believes that he did it," "everyone knows and loves him," and "he was in the wrong place at the wrong time;" and even on the poor character of the defendant's girlfriend, Teyuanna Cummings—"a drinker," a "known reputation of getting drunk, leaving the kids in the house by themselves, beating on the kids."[9] No one could seriously argue that this kind of testimony would be admissible at a trial. (*See People v Koury* [trial court properly rejected defendant's mother's testimony about the defendant's personality].) Channeling it through Dr. Bardey does not transform it into admissible testimony.

At a trial, the defense will be free to ask potential jurors whether they accept the possibility that a person could confess falsely, to cross-examine the detectives about the circumstances of their interview of the defendant, and to call the defendant or any other relevant, appropriate fact witness to testify. The court will also give the appropriate instructions to the jurors about how they should evaluate the evidence of the defendant's state-

---

**8.** One-sided as it is, *Dr. Bardey's report is not even internally consistent.* The defendant told Dr. Bardey that the police frequently targeted him and his friends without cause, "beat[ing] up" his friends, and frisking them "on a daily basis." He claimed that his brother was wrongfully convicted, that the 75th Precinct was "corrupt," and that the police in the neighborhood "violate all around the board." This obvious mistrust of law enforcement hardly comports with Dr. Bardey's description of the defendant as passive and compliant.

**9.** As noted, it is the defense position that Ms. Cummings killed the child.

ments. In this case, however, permitting Drs. Redlich and Bardey to testify would be tantamount to permitting professionally trained witnesses to parade their credentials before the jury without any justification. This testimony would be an invasion of the jury's "vital and exclusive function to make credibility determinations." (*United States v Adams*, 271 F3d 1236, 1245 [10th Cir 2001].)

The defendant's motion to admit expert testimony regarding the phenomenon of false confessions is denied.